(Slip Opinion) OCTOBER TERM, 2019 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME *v.* PENNSYLVANIA ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 19–431. Argued May 6, 2020—Decided July 8, 2020*

The Patient Protection and Affordable Care Act of 2010 (ACA) requires covered employers to provide women with "preventive care and screenings" without "any cost sharing requirements," and relies on Preventive Care Guidelines (Guidelines) "supported by the Health Resources and Services Administration" (HRSA) to determine what "preventive care and screenings" includes. 42 U. S. C. §300gg–13(a)(4). Those Guidelines mandate that health plans provide coverage for all Food and Drug Administration approved contraceptive methods. When the Departments of Health and Human Services, Labor, and the Treasury (Departments) incorporated the Guidelines, they also gave HRSA the discretion to exempt religious employers, such as churches, from providing contraceptive coverage. Later, the Departments also promulgated a rule accommodating qualifying religious organizations that allowed them to opt out of coverage by self-certifying that they met certain criteria to their health insurance issuer, which would then exclude contraceptive coverage from the employer's plan and provide participants with separate payments for contraceptive services without imposing any cost-sharing requirements.

Religious entities challenged the rules under the Religious Freedom Restoration Act of 1993 (RFRA). In *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, this Court held that the contraceptive mandate substantially burdened the free exercise of closely held corporations with sincerely held religious objections to providing their employees with certain methods of contraception. And in *Zubik* v. *Burwell*, 578

————————

* Together with 19–454, *Trump, President of the United States, et al.* v. *Pennsylvania et al.*, on certiorari to the same Court.

U. S. ___, the Court opted to remand without deciding the RFRA question in cases challenging the self-certification accommodation so that the parties could develop an approach that would accommodate employers' concerns while providing women full and equal coverage.

Under *Zubik*'s direction and in light of *Hobby Lobby*'s holding, the Departments promulgated two interim final rules (IFRs). The first significantly expanded the church exemption to include an employer that "objects . . . based on its sincerely held religious beliefs," "to its establishing, maintaining, providing, offering, or arranging [for] coverage or payments for some or all contraceptive services." 82 Fed. Reg. 47812. The second created a similar "moral exemption" for employers with sincerely held moral objections to providing some or all forms of contraceptive coverage. The Departments requested post-promulgation comments on both IFRs.

Pennsylvania sued, alleging that the IFRs were procedurally and substantively invalid under the Administrative Procedure Act (APA). After the Departments issued final rules, responding to post-promulgation comments but leaving the IFRs largely intact, New Jersey joined Pennsylvania's suit. Together they filed an amended complaint, alleging that the rules were substantively unlawful because the Departments lacked statutory authority under either the ACA or RFRA to promulgate the exemptions. They also argued that the rules were procedurally defective because the Departments failed to comply with the APA's notice and comment procedures. The District Court issued a preliminary nationwide injunction against the implementation of the final rules, and the Third Circuit affirmed.

*Held*:

1. The Departments had the authority under the ACA to promulgate the religious and moral exemptions. Pp. 14–22.

(a) As legal authority for both exemptions, the Departments invoke §300gg–13(a)(4), which states that group health plans must provide women with "preventive care and screenings . . . as provided for in comprehensive guidelines supported by [HRSA]." The pivotal phrase, "as provided for," grants sweeping authority to HRSA to define the preventive care that applicable health plans must cover. That same grant of authority empowers it to identify and create exemptions from its own Guidelines. The "fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts,'" *Rotkiske* v. *Klemm*, 589 U. S. ___, ___ applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text, see *Watt* v. *Energy Action Ed. Foundation*, 454 U. S. 151, 168. Concerns that the exemptions thwart Congress' intent by making it significantly harder

for interested women to obtain seamless access to contraception without cost-sharing cannot justify supplanting the text's plain meaning. Even if such concerns are legitimate, they are more properly directed at the regulatory mechanism that Congress put in place. Pp. 14–18.

(b) Because the ACA provided a basis for both exemptions, the Court need not decide whether RFRA independently compelled the Departments' solution. However, the argument that the Departments could not consider RFRA at all is without merit. It is clear from the face of the statute that the contraceptive mandate is capable of violating RFRA. The ACA does not explicitly exempt RFRA, and the regulations implementing the contraceptive mandate qualify as "Federal law" or "the implementation of [Federal] law" under RFRA. §2000bb–3(a). Additionally, this Court stated in *Hobby Lobby* that the mandate violated RFRA as applied to entities with complicity-based objections. And both *Hobby Lobby* and *Zubik* instructed the Departments to consider RFRA going forward. Moreover, in light of the basic requirements of the rulemaking process, the Departments' failure to discuss RFRA at all when formulating their solution would make them susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem. Pp. 19–22.

2. The rules promulgating the exemptions are free from procedural defects. Pp. 22–26.

(a) Respondents claim that because the final rules were preceded by a document entitled "Interim Final Rules with Request for Comments" instead of "General Notice of Proposed Rulemaking," they are procedurally invalid under the APA. The IFRs' request for comments readily satisfied the APA notice requirements. And even assuming that the APA requires an agency to publish a document entitled "notice of proposed rulemaking," there was no "prejudicial error" here, 5 U. S. C. §706. Pp. 22–24.

(b) Pointing to the fact that the final rules made only minor alterations to the IFRs, respondents also contend that the final rules are procedurally invalid because nothing in the record suggests that the Departments maintained an open mind during the post-promulgation process. The "open-mindedness" test has no basis in the APA. Each of the APA's procedural requirements was satisfied: The IFRs provided sufficient notice, §553(b); the Departments "g[a]ve interested persons an opportunity to participate in the rule making through submission of written data, views or arguments," §553(c); the final rules contained "a concise general statement of their basis and purpose," *ibid.*; and they were published more than 30 days before they became effective, §553(d). Pp. 24–26.

930 F. 3d 543, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, and KAVANAUGH, JJ., joined. ALITO, J., filed a concurring opinion, in which GORSUCH, J., joined. KAGAN, J., filed an opinion concurring in the judgment, in which BREYER, J., joined. GINSBURG, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 19–431 and 19–454

———

LITTLE SISTERS OF THE POOR SAINTS PETER
AND PAUL HOME, PETITIONER
19–431           *v.*
PENNSYLVANIA, ET AL.


DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS
19–454           *v.*
PENNSYLVANIA, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[July 8, 2020]

JUSTICE THOMAS delivered the opinion of the Court.

In these consolidated cases, we decide whether the Government created lawful exemptions from a regulatory requirement implementing the Patient Protection and Affordable Care Act of 2010 (ACA), 124 Stat. 119. The requirement at issue obligates certain employers to provide contraceptive coverage to their employees through their group health plans. Though contraceptive coverage is not required by (or even mentioned in) the ACA provision at issue, the Government mandated such coverage by promulgating interim final rules (IFRs) shortly after the ACA's passage. This requirement is known as the contraceptive mandate.

After six years of protracted litigation, the Departments

of Health and Human Services, Labor, and the Treasury
(Departments)—which jointly administer the relevant ACA
provision[1]—exempted certain employers who have religious
and conscientious objections from this agency-created man-
date. The Third Circuit concluded that the Departments
lacked statutory authority to promulgate these exemptions
and affirmed the District Court's nationwide preliminary
injunction. This decision was erroneous. We hold that the
Departments had the authority to provide exemptions from
the regulatory contraceptive requirements for employers
with religious and conscientious objections. We accordingly
reverse the Third Circuit's judgment and remand with in-
structions to dissolve the nationwide preliminary injunc-
tion.

I

The ACA's contraceptive mandate—a product of agency
regulation—has existed for approximately nine years. Lit-
igation surrounding that requirement has lasted nearly as
long. In light of this extensive history, we begin by summa-
rizing the relevant background.

A

The ACA requires covered employers to offer "a group
health plan or group health insurance coverage" that pro-
vides certain "minimum essential coverage." 26 U. S. C.
§5000A(f)(2); §§4980H(a), (c)(2). Employers who do not
comply face hefty penalties, including potential fines of
$100 per day for each affected employee. §§4980D(a)–(b);
see also *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682,
696–697 (2014). These cases concern regulations promul-
gated under a provision of the ACA that requires covered
employers to provide women with "preventive care and
screenings" without "any cost sharing requirements." 42

_____

[1] See 42 U. S. C. §300gg–92; 29 U. S. C. §1191c; 26 U. S. C. §9833.

U. S. C. §300gg–13(a)(4).[2]

The statute does not define "preventive care and screenings," nor does it include an exhaustive or illustrative list of such services.  Thus, the statute itself does not explicitly require coverage for any specific form of "preventive care." *Hobby Lobby*, 573 U. S., at 697.  Instead, Congress stated that coverage must include "such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" (HRSA), an agency of the Department of Health and Human Services (HHS).  §300gg–13(a)(4).  At the time of the ACA's enactment, these guidelines were not yet written.  As a result, no specific forms of preventive care or screenings were (or could be) referred to or incorporated by reference.

Soon after the ACA's passage, the Departments began promulgating rules related to §300gg–13(a)(4).  But in doing so, the Departments did not proceed through the notice and comment rulemaking process, which the Administrative Procedure Act (APA) often requires before an agency's regulation can "have the force and effect of law." *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 96 (2015) (internal quotation marks omitted); see also 5 U. S. C. §553. Instead, the Departments invoked the APA's good cause exception, which permits an agency to dispense with notice and comment and promulgate an IFR that carries immediate legal force.  §553(b)(3)(B).

The first relevant IFR, promulgated in July 2010, primarily focused on implementing other aspects of §300gg–13.  75

---

[2] The ACA exempts "grandfathered" plans from 42 U. S. C. §300gg–13(a)(4)—*i.e.*, "those [plans] that existed prior to March 23, 2010, and that have not made specified changes after that date." *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 699 (2014). See §§18011(a), (e); 29 CFR §2590.715–1251 (2019). As of 2018, an estimated 16 percent of employees "with employer-sponsored coverage were enrolled in a grandfathered group health plan."  84 Fed. Reg. 5971 (2019).

Fed. Reg. 41728. The IFR indicated that HRSA planned to develop its Preventive Care Guidelines (Guidelines) by August 2011. *Ibid.* However, it did not mention religious exemptions or accommodations of any kind.

As anticipated, HRSA released its first set of Guidelines in August 2011. The Guidelines were based on recommendations compiled by the Institute of Medicine (now called the National Academy of Medicine), "a nonprofit group of volunteer advisers." *Hobby Lobby*, 573 U. S., at 697. The Guidelines included the contraceptive mandate, which required health plans to provide coverage for all contraceptive methods and sterilization procedures approved by the Food and Drug Administration as well as related education and counseling. 77 Fed. Reg. 8725 (2012).

The same day the Guidelines were issued, the Departments amended the 2010 IFR. 76 Fed. Reg. 46621 (2011). When the 2010 IFR was originally published, the Departments began receiving comments from numerous religious employers expressing concern that the Guidelines would "impinge upon their religious freedom" if they included contraception. *Id.*, at 46623. As just stated, the Guidelines ultimately did contain contraceptive coverage, thus making the potential impact on religious freedom a reality. In the amended IFR, the Departments determined that "it [was] appropriate that HRSA . . . tak[e] into account the [mandate's] effect on certain religious employers" and concluded that HRSA had the discretion to do so through the creation of an exemption. *Ibid.* The Departments then determined that the exemption should cover religious employers, and they set out a four-part test to identify which employers qualified. The last criterion required the entity to be a church, an integrated auxiliary, a convention or association of churches, or "the exclusively religious activities of any religious order." *Ibid.* HRSA created an exemption for these employers the same day. 78 Fed. Reg. 39871 (2013).

Because of the narrow focus on churches, this first exemption is known as the church exemption.

The Guidelines were scheduled to go into effect for plan years beginning on August 1, 2012. 77 Fed. Reg. 8725–8726. But in February 2012, before the Guidelines took effect, the Departments promulgated a final rule that temporarily prevented the Guidelines from applying to certain religious nonprofits. Specifically, the Departments stated their intent to promulgate additional rules to "accommodat[e] non-exempted, non-profit organizations' religious objections to covering contraceptive services." *Id.*, at 8727. Until that rulemaking occurred, the 2012 rule also provided a temporary safe harbor to protect such employers. *Ibid.* The safe harbor covered nonprofits "whose plans have consistently not covered all or the same subset of contraceptive services for religious reasons."[3] Thus, the nonprofits who availed themselves of this safe harbor were not subject to the contraceptive mandate when it first became effective.

The Departments promulgated another final rule in 2013 that is relevant to these cases in two ways. First, after reiterating that §300gg–13(a)(4) authorizes HRSA "to issue guidelines in a manner that exempts group health plans established or maintained by religious employers," the Departments "simplif[ied]" and "clarif[ied]" the definition of a religious employer. 78 Fed. Reg. 39873.[4] Second, pursuant

––––––––––

[3] Dept. of Health and Human Servs., Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers With Respect to the Requirement To Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, p. 2 (2013).

[4] The Departments took this action to prevent an unduly narrow interpretation of the church exemption, in which "an otherwise exempt plan [was] disqualified because the employer's purposes extend[ed] beyond the inculcation of religious values or because the employer . . . serve[d]

to that same authority, the Departments provided the anticipated accommodation for eligible religious organizations, which the regulation defined as organizations that "(1) [o]ppos[e] providing coverage for some or all of the contraceptive services . . . on account of religious objections; (2) [are] organized and operat[e] as . . . nonprofit entit[ies]; (3) hol[d] [themselves] out as . . . religious organization[s]; and (4) self-certif[y] that [they] satisf[y] the first three criteria." *Id.*, at 39874. The accommodation required an eligible organization to provide a copy of the self-certification form to its health insurance issuer, which in turn would exclude contraceptive coverage from the group health plan and provide payments to beneficiaries for contraceptive services separate from the health plan. *Id.*, at 39878. The Departments stated that the accommodation aimed to "protec[t]" religious organizations "from having to contract, arrange, pay, or refer for [contraceptive] coverage" in a way that was consistent with and did not violate the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.* 78 Fed. Reg. 39871, 39886–39887. This accommodation is referred to as the self-certification accommodation.

## B

Shortly after the Departments promulgated the 2013 final rule, two religious nonprofits run by the Little Sisters of the Poor (Little Sisters) challenged the self-certification accommodation. The Little Sisters "are an international congregation of Roman Catholic women religious" who have operated homes for the elderly poor in the United States since 1868. See Mission Statement: Little Sisters of the Poor, http://www.littlesistersofthepoor.org/mission-statement.

---

people of different religious faiths." 78 Fed. Reg. 39874. But see *post*, at 12–13 (GINSBURG, J., dissenting) (arguing that the church exemption only covered houses of worship).

They feel called by their faith to care for their elderly residents regardless of "faith, finances, or frailty." Brief for Residents and Families of Residents at Homes of the Little Sisters of the Poor as *Amici Curiae* 14. The Little Sisters endeavor to treat all residents "as if they were Jesus [Christ] himself, cared for as family, and treated with dignity until God calls them to his home." Complaint ¶14 in *Little Sisters of the Poor Home for the Aged, Denver, Colo.* v. *Sebelius*, No. 1:13–cv–02611 (D Colo.), p. 5 (Complaint).

Consistent with their Catholic faith, the Little Sisters hold the religious conviction "that deliberately avoiding reproduction through medical means is immoral." *Little Sisters of the Poor Home for the Aged, Denver, Colo.* v. *Burwell*, 794 F. 3d 1151, 1167 (CA10 2015). They challenged the self-certification accommodation, claiming that completing the certification form would force them to violate their religious beliefs by "tak[ing] actions that directly cause others to provide contraception or appear to participate in the Departments' delivery scheme." *Id.*, at 1168. As a result, they alleged that the self-certification accommodation violated RFRA. Under RFRA, a law that substantially burdens the exercise of religion must serve "a compelling governmental interest" and be "the least restrictive means of furthering that compelling governmental interest." §§2000bb–1(a)–(b). The Court of Appeals disagreed that the self-certification accommodation substantially burdened the Little Sisters' free exercise rights and thus rejected their RFRA claim. *Little Sisters*, 794 F. 3d, at 1160.

The Little Sisters were far from alone in raising RFRA challenges to the self-certification accommodation. Religious nonprofit organizations and educational institutions across the country filed a spate of similar lawsuits, most resulting in rulings that the accommodation did not violate RFRA. See, *e.g.*, *East Texas Baptist Univ.* v. *Burwell*, 793 F. 3d 449 (CA5 2015); *Geneva College* v. *Secretary, U. S. Dept. of Health and Human Servs.*, 778 F. 3d 422 (CA3

2015); *Priests for Life* v. *United States Dept. of Health and Human Servs.*, 772 F. 3d 229 (CADC 2014); *Michigan Catholic Conference* v. *Burwell*, 755 F. 3d 372 (CA6 2014); *University of Notre Dame* v. *Sebelius*, 743 F. 3d 547 (CA7 2014); but see *Sharpe Holdings, Inc.* v. *United States Dept. of Health and Human Servs.*, 801 F. 3d 927 (CA8 2015); *Dordt College* v. *Burwell*, 801 F. 3d 946 (CA8 2015). We granted certiorari in cases from four Courts of Appeals to decide the RFRA question. *Zubik* v. *Burwell*, 578 U. S. ___, ___ (2016) (*per curiam*). Ultimately, however, we opted to remand the cases without deciding that question. In supplemental briefing, the Government had "confirm[ed]" that "'contraceptive coverage could be provided to petitioners' employees, through petitioners' insurance companies, without any . . . notice from petitioners.'" *Id.*, at ___ (slip op., at 3). Petitioners, for their part, had agreed that such an approach would not violate their free exercise rights. *Ibid.* Accordingly, because all parties had accepted that an alternative approach was "feasible," *ibid.*, we directed the Government to "accommodat[e] petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage," *id.*, at ___ (slip op., at 4) (internal quotation marks omitted).

## C

*Zubik* was not the only relevant ruling from this Court about the contraceptive mandate. As the Little Sisters and numerous others mounted their challenges to the self-certification accommodation, a host of other entities challenged the contraceptive mandate itself as a violation of RFRA. See, *e.g.*, *Hobby Lobby Stores, Inc.* v. *Sebelius*, 723 F. 3d 1114 (CA10 2013) (en banc); *Korte* v. *Sebelius*, 735 F. 3d 654 (CA7 2013); *Gilardi* v. *United States Dept. of Health and Human Servs.*, 733 F. 3d 1208 (CADC 2013); *Conestoga Wood Specialties Corp.* v. *Secretary of U. S. Dept.*

*of Health and Human Servs.*, 724 F. 3d 377 (CA3 2013); *Autocam Corp.* v. *Sebelius*, 730 F. 3d 618 (CA6 2013). This Court granted certiorari in two cases involving three closely held corporations to decide whether the mandate violated RFRA. *Hobby Lobby*, 573 U. S. 682.

The individual respondents in *Hobby Lobby* opposed four methods of contraception covered by the mandate. They sincerely believed that human life begins at conception and that, because the challenged methods of contraception risked causing the death of a human embryo, providing those methods of contraception to employees would make the employers complicit in abortion. *Id.*, at 691, 720. We held that the mandate substantially burdened respondents' free exercise, explaining that "[if] the owners comply with the HHS mandate, they believe they will be facilitating abortions, and if they do not comply, they will pay a very heavy price." *Id.*, at 691. "If these consequences do not amount to a substantial burden," we stated, "it is hard to see what would." *Ibid.* We also held that the mandate did not utilize the least restrictive means, citing the self-certification accommodation as a less burdensome alternative. *Id.*, at 730–731.

Thus, as the Departments began the task of reformulating rules related to the contraceptive mandate, they did so not only under *Zubik*'s direction to accommodate religious exercise, but also against the backdrop of *Hobby Lobby*'s pronouncement that the mandate, standing alone, violated RFRA as applied to religious entities with complicity-based objections.

### D

In 2016, the Departments attempted to strike the proper balance a third time, publishing a request for information on ways to comply with *Zubik*. 81 Fed. Reg. 47741. This attempt proved futile, as the Departments ultimately concluded that "no feasible approach" had been identified.

Dept. of Labor, FAQs About Affordable Care Act Implemen-
tation Part 36, p. 4 (2017).  The Departments maintained
their position that the self-certification accommodation was
consistent with RFRA because it did not impose a substan-
tial burden and, even if it did, it utilized the least restrictive
means of achieving the Government's interests.  *Id.*, at 4–
5.

In 2017, the Departments tried yet again to comply with
*Zubik*, this time by promulgating the two IFRs that served
as the impetus for this litigation.  The first IFR significantly
broadened the definition of an exempt religious employer to
encompass an employer that "objects . . . based on its sin-
cerely held religious beliefs," "to its establishing, maintain-
ing, providing, offering, or arranging [for] coverage or pay-
ments for some or all contraceptive services."  82 Fed. Reg.
47812 (2017).  Among other things, this definition included
for-profit and publicly traded entities.  Because they were
exempt, these employers did not need to participate in the
accommodation   process,   which   nevertheless   remained
available under the IFR.  *Id.*, at 47806.

As with their previous regulations, the Departments once
again invoked §300gg–13(a)(4) as authority to promulgate
this "religious exemption," stating that it "include[d] the
ability to exempt entities from coverage requirements an-
nounced in HRSA's Guidelines."  *Id.*, at 47794.  Additional-
ly, the Departments announced for the first time that
RFRA compelled the creation of, or at least provided the
discretion to create, the religious exemption.  *Id.*, at 47800–
47806.    As the Departments explained: "We know from
*Hobby Lobby* that, in the absence of any accommodation,
the contraceptive-coverage requirement imposes a substan-
tial burden on certain objecting employers.  We know from
other lawsuits and public comments that many religious en-
tities have objections to complying with the [self-certification]
accommodation based on their sincerely held religious be-
liefs."  *Id.*, at 47806.  The Departments "believe[d] that the

Court's analysis in *Hobby Lobby* extends, for the purposes of analyzing a substantial burden, to the burdens that an entity faces when it religiously opposes participating in the [self-certification] accommodation process." *Id.*, at 47800. They thus "conclude[d] that it [was] appropriate to expand the exemption to other . . . organizations with sincerely held religious beliefs opposed to contraceptive coverage." *Id.*, at 47802; see also *id.*, at 47810–47811.

The second IFR created a similar "moral exemption" for employers—including nonprofits and for-profits with no publicly traded components—with "sincerely held moral" objections to providing some or all forms of contraceptive coverage. *Id.*, at 47850, 47861–47862. Citing congressional enactments, precedents from this Court, agency practice, and state laws that provided for conscience protections, *id.*, at 47844–47847, the Departments invoked their authority under the ACA to create this exemption, *id.*, at 47844. The Departments requested post-promulgation comments on both IFRs. *Id.*, at 47813, 47854.

E

Within a week of the 2017 IFRs' promulgation, the Commonwealth of Pennsylvania filed an action seeking declaratory and injunctive relief. Among other claims, it alleged that the IFRs were procedurally and substantively invalid under the APA. The District Court held that the Commonwealth was likely to succeed on both claims and granted a preliminary nationwide injunction against the IFRs. The Federal Government appealed.

While that appeal was pending, the Departments issued rules finalizing the 2017 IFRs. See 83 Fed. Reg. 57536 (2018); 83 Fed. Reg. 57592, codified at 45 CFR pt. 147 (2018). Though the final rules left the exemptions largely intact, they also responded to post-promulgation comments, explaining their reasons for neither narrowing nor expanding the exemptions beyond what was provided for in the

IFRs. See 83 Fed. Reg. 57542–57545, 57598–57603. The
final rule creating the religious exemption also contained a
lengthy analysis of the Departments' changed position re-
garding whether the self-certification process violated
RFRA. *Id.*, at 57544–57549. And the Departments ex-
plained that, in the wake of the numerous lawsuits chal-
lenging the self-certification accommodation and the failed
attempt to identify alternative accommodations after the
2016 request for information, "an expanded exemption ra-
ther than the existing accommodation is the most appropri-
ate administrative response to the substantial burden iden-
tified by the Supreme Court in *Hobby Lobby*." *Id.*, at
57544–57545.

After the final rules were promulgated, the State of New
Jersey joined Pennsylvania's suit and, together, they filed
an amended complaint. As relevant, the States—respond-
ents here—once again challenged the rules as substantively
and procedurally invalid under the APA. They alleged that
the rules were substantively unlawful because the Depart-
ments lacked statutory authority under either the ACA or
RFRA to promulgate the exemptions. Respondents also as-
serted that the IFRs were not adequately justified by good
cause, meaning that the Departments impermissibly used
the IFR procedure to bypass the APA's notice and comment
procedures. Finally, respondents argued that the pur-
ported procedural defects of the IFRs likewise infected the
final rules.

The District Court issued a nationwide preliminary in-
junction against the implementation of the final rules the
same day the rules were scheduled to take effect. The Fed-
eral Government appealed, as did one of the homes oper-
ated by the Little Sisters, which had in the meantime inter-
vened in the suit to defend the religious exemption.[5] The

_____

[5] The Little Sisters moved to intervene in the District Court to defend

appeals were consolidated with the previous appeal, which had been stayed.

The Third Circuit affirmed. In its view, the Departments lacked authority to craft the exemptions under either statute. The Third Circuit read 42 U. S. C. §300gg–13(a)(4) as empowering HRSA to determine which services should be included as preventive care and screenings, but not to carve out exemptions from those requirements. It also concluded that RFRA did not compel or permit the religious exemption because, under Third Circuit precedent that was vacated and remanded in *Zubik*, the Third Circuit had concluded that the self-certification accommodation did not impose a substantial burden on free exercise. As for respondents' procedural claim, the court held that the Departments lacked good cause to bypass notice and comment when promulgating the 2017 IFRs. In addition, the court determined that, because the IFRs and final rules were "virtually identical," "[t]he notice and comment exercise surrounding the Final Rules [did] not reflect any real open-mindedness." *Pennsylvania* v. *President of United States*, 930 F. 3d 543, 568–569 (2019). Though it rebuked the Departments for their purported attitudinal deficiencies, the Third Circuit did not identify any specific public comments to which the agency did not appropriately respond. *Id.*, at 569, n. 24.[6]

———————

the 2017 religious-exemption IFR, but the District Court denied that motion. The Third Circuit reversed. After that reversal, the Little Sisters appealed the District Court's preliminary injunction of the 2017 IFRs, and that appeal was consolidated with the Federal Government's appeal.

[6] The Third Circuit also determined *sua sponte* that the Little Sisters lacked appellate standing to intervene because a District Court in Colorado had permanently enjoined the contraceptive mandate as applied to plans in which the Little Sisters participate. This was error. Under our precedents, at least one party must demonstrate Article III standing for each claim for relief. An intervenor of right must independently demonstrate Article III standing if it pursues relief that is broader than or different from the party invoking a court's jurisdiction. See *Town of Chester* v. *Laroe Estates, Inc.*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 6). Here, the

We granted certiorari. 589 U. S. ___ (2020).

II

Respondents contend that the 2018 final rules providing religious and moral exemptions to the contraceptive mandate are both substantively and procedurally invalid. We begin with their substantive argument that the Departments lacked statutory authority to promulgate the rules.

A

The Departments invoke 42 U. S. C. §300gg–13(a)(4) as legal authority for both exemptions. This provision of the ACA states that, "with respect to women," "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide . . . such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by [HRSA]." The Departments maintain, as they have since 2011, that the phrase "as provided for" allows HRSA both to identify what preventive care and screenings must be covered and to exempt or accommodate certain employers' religious objections. See 83 Fed. Reg. 57540–57541; see also *post*, at 3 (KAGAN, J., concurring in judgment). They also argue that, as with the church exemption, their role as the administering agencies permits them to guide HRSA in its discretion by "defining the scope of permissible exemptions and accommodations for such guidelines." 82 Fed. Reg. 47794. Respondents, on the other hand, contend that §300gg–13(a)(4) permits HRSA to only list the preventive care and screenings that health plans "shall . . . provide," not to exempt entities from covering

_____

Federal Government clearly had standing to invoke the Third Circuit's appellate jurisdiction, and both the Federal Government and the Little Sisters asked the court to dissolve the injunction against the religious exemption. The Third Circuit accordingly erred by inquiring into the Little Sisters' independent Article III standing.

those identified services.  Because that asserted limitation is found nowhere in the statute, we agree with the Departments.

"Our analysis begins and ends with the text." *Octane Fitness, LLC* v. *ICON Health & Fitness, Inc.*, 572 U. S. 545, 553 (2014).  Here, the pivotal phrase is "as provided for." To "provide" means to supply, furnish, or make available. See Webster's Third New International Dictionary 1827 (2002) (Webster's Third); American Heritage Dictionary 1411 (4th ed. 2000); 12 Oxford English Dictionary 713 (2d ed. 1989).  And, as the Departments explained, the word "as" functions as an adverb modifying "provided," indicating "the manner in which" something is done.  83 Fed. Reg. 57540.  See also Webster's Third 125; 1 Oxford English Dictionary, at 673; American Heritage Dictionary 102 (5th ed. 2011).

On its face, then, the provision grants sweeping authority to HRSA to craft a set of standards defining the preventive care that applicable health plans must cover.  But the statute is completely silent as to *what* those "comprehensive guidelines" must contain, or how HRSA must go about creating them.  The statute does not, as Congress has done in other statutes, provide an exhaustive or illustrative list of the preventive care and screenings that must be included. See, *e.g.*, 18 U. S. C. §1961(1); 28 U. S. C. §1603(a).  It does not, as Congress did elsewhere in the same section of the ACA, set forth any criteria or standards to guide HRSA's selections.  See, *e.g.*, 42 U. S. C. §300gg–13(a)(3) (requiring "*evidence-informed* preventive care and screenings" (emphasis added)); §300gg–13(a)(1) ("evidence-based items or services").  It does not, as Congress has done in other contexts, require that HRSA consult with or refrain from consulting with any party in the formulation of the Guidelines. See, *e.g.*, 16 U. S. C. §1536(a)(1); 23 U. S. C. §138.  This means that HRSA has virtually unbridled discretion to decide what counts as preventive care and screenings.  But

the same capacious grant of authority that empowers
HRSA to make these determinations leaves its discretion
equally unchecked in other areas, including the ability to
identify and create exemptions from its own Guidelines.

Congress could have limited HRSA's discretion in any
number of ways, but it chose not to do so. See *Ali* v. *Federal
Bureau of Prisons*, 552 U. S. 214, 227 (2008); see also *Rotkiske* v. *Klemm*, 589 U. S. ___, ___ (2019) (slip op., at 6);
*Husted* v. *A. Philip Randolph Institute*, 584 U. S. ___, ___
(2018) (slip op., at 16). Instead, it enacted "'expansive language offer[ing] no indication whatever'" that the statute
limits what HRSA can designate as preventive care and
screenings or who must provide that coverage. *Ali*, 552
U. S., at 219–220 (quoting *Harrison* v. *PPG Industries, Inc.*,
446 U. S. 578, 589 (1980)). "It is a fundamental principle of
statutory interpretation that 'absent provision[s] cannot be
supplied by the courts.'" *Rotkiske*, 589 U. S., at ___ (slip
op., at 5) (quoting A. Scalia & B. Garner, Reading Law: The
Interpretation of Legal Texts 94 (2012)); *Nichols* v. *United
States*, 578 U. S. ___, ___ (2016) (slip op., at 6). This principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion
that are not supported by the text. See *Watt* v. *Energy Action Ed. Foundation*, 454 U. S. 151, 168 (1981). By introducing a limitation not found in the statute, respondents
ask us to alter, rather than to interpret, the ACA. See *Nichols*, 578 U. S., at ___ (slip op., at 6).

By its terms, the ACA leaves the Guidelines' content to
the exclusive discretion of HRSA. Under a plain reading of
the statute, then, we conclude that the ACA gives HRSA
broad discretion to define preventive care and screenings
and to create the religious and moral exemptions.[7]

———————
[7] Though not necessary for this analysis, our decisions in *Zubik* v. *Burwell*, 578 U. S. ___ (2016) (*per curiam*), and *Hobby Lobby*, 573 U. S. 682,
implicitly support the conclusion that §300gg–13(a)(4) empowered HRSA

The dissent resists this conclusion, asserting that the Departments' interpretation thwarts Congress' intent to provide contraceptive coverage to the women who are interested in receiving such coverage. See *post*, at 1, 21 (opinion of GINSBURG, J.). It also argues that the exemptions will make it significantly harder for interested women to obtain seamless access to contraception without cost sharing, *post*, at 15–17, which we have previously "assume[d]" is a compelling governmental interest, *Hobby Lobby*, 573 U. S., at 728; but see *post*, at 10–12 (ALITO, J., concurring). The Departments dispute that women will be adversely impacted by the 2018 exemptions. 82 Fed. Reg. 47805. Though we express no view on this disagreement, it bears noting that such a policy concern cannot justify supplanting the text's plain meaning. See *Gitlitz* v. *Commissioner*, 531 U. S. 206, 220 (2001). "It is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended." *Lewis* v. *Chicago*, 560 U. S. 205, 215 (2010).

Moreover, even assuming that the dissent is correct as an empirical matter, its concerns are more properly directed at

_____

to create the exemptions. As respondents acknowledged at oral argument, accepting their interpretation of the ACA would require us to conclude that the Departments had no authority under the ACA to promulgate the initial church exemption, see Tr. of Oral Arg. 69–71, 91, which by extension would mean that the Departments lacked authority for the 2013 self-certification accommodation. That reading of the ACA would create serious tension with *Hobby Lobby*, which pointed to the self-certification accommodation as an example of a less restrictive means available to the Government, 573 U. S., at 730–731, and *Zubik*, which expressly directed the Departments to "accommodat[e]" petitioners' religious exercise, 578 U. S., at ___ (slip op., at 4). It would be passing strange for this Court to direct the Departments to make such an accommodation if it thought the ACA did not authorize one. In addition, we are not aware of, and the dissent does not point to, a single case predating *Hobby Lobby* or *Zubik* in which the Departments took the position that they could not adopt a different approach because they lacked the statutory authority under the ACA to do so.

the regulatory mechanism that Congress put in place to
protect this assumed governmental interest. As even the
dissent recognizes, contraceptive coverage is mentioned no-
where in §300gg–13(a)(4), and no language in the statute
itself even hints that Congress intended that contraception
should or must be covered. See *post*, at 4–5 (citing legisla-
tive history and *amicus* briefs). Thus, contrary to the dis-
sent's protestations, it was Congress, not the Departments,
that declined to expressly require contraceptive coverage in
the ACA itself. See 83 Fed. Reg. 57540. And, it was Con-
gress' deliberate choice to issue an extraordinarily "broad
general directiv[e]" to HRSA to craft the Guidelines, with-
out any qualifications as to the substance of the Guidelines
or whether exemptions were permissible. *Mistretta* v.
*United States*, 488 U. S. 361, 372 (1989). Thus, it is Con-
gress, not the Departments, that has failed to provide the
protection for contraceptive coverage that the dissent
seeks.[8]

No party has pressed a constitutional challenge to the
breadth of the delegation involved here. Cf. *Gundy* v.
*United States*, 588 U. S. ___ (2019). The only question we
face today is what the plain language of the statute author-
izes. And the plain language of the statute clearly allows
the Departments to create the preventive care standards as
well as the religious and moral exemptions.[9]

———————

[8] HRSA has altered its Guidelines multiple times since 2011, always
proceeding without notice and comment. See 82 Fed. Reg. 47813–47814;
83 Fed. Reg. 8487; 85 Fed. Reg. 722–723 (2020). Accordingly, if HRSA
chose to exercise that discretion to remove contraception coverage from
the next iteration of its Guidelines, it would arguably nullify the contra-
ceptive mandate altogether without proceeding through notice and com-
ment. The combination of the agency practice of proceeding without no-
tice and comment and HRSA's discretion to alter the Guidelines, though
not necessary for our analysis, provides yet another indication of Con-
gress' failure to provide strong protections for contraceptive coverage.

[9] The dissent does not attempt to argue that the self-certification ac-
commodation can coexist with its interpretation of the ACA. As for the

B

The Departments also contend, consistent with the reasoning in the 2017 IFR and the 2018 final rule establishing the religious exemption, that RFRA independently compelled the Departments' solution or that it at least authorized it.[10]  In light of our holding that the ACA provided a basis for both exemptions, we need not reach these arguments.[11]  We do, however, address respondents' argument that the Departments could not even consider RFRA as they formulated the religious exemption from the contraceptive mandate.  Particularly in the context of these cases, it was appropriate for the Departments to consider RFRA.

As we have explained, RFRA "provide[s] very broad protection for religious liberty."  *Hobby Lobby*, 573 U. S., at 693.  In RFRA's congressional findings, Congress stated that "governments should not substantially burden religious exercise," a right described by RFRA as "unalienable." 42 U. S. C. §§2000bb(a)(1), (3).  To protect this right, Con-

_____

church exemption, the dissent claims that it is rooted in the First Amendment's respect for church autonomy.  See *post*, at 12–13.  But the dissent points to no case, brief, or rule in the nine years since the church exemption's implementation in which the Departments defended its validity on that ground.  The most the dissent can point to is a stray comment in the rule that expanded the self-certification accommodation to closely held corporations in the wake of *Hobby Lobby*.  See *post*, at 13 (quoting 80 Fed. Reg. 41325 (2015)).

[10] The dissent claims that "all agree" that the exemption is not supported by the Free Exercise Clause.  *Post*, at 2.  A constitutional claim is not presented in these cases, and we express no view on the merits of that question.

[11] The dissent appears to agree that the Departments had authority under RFRA to "cure" any RFRA violations caused by its regulations. See *post*, at 14, n. 16 (disclaiming the view that agencies must wait for courts to determine a RFRA violation); see also *supra*, at 5 (explaining that the safe harbor and commitment to developing an accommodation occurred prior to the Guidelines going into effect).  The dissent also does not—as it cannot—dispute our directive in *Zubik*.

gress provided that the "[g]overnment shall not substan-
tially burden a person's exercise of religion even if the bur-
den results from a rule of general applicability" unless "it
demonstrates that application of the burden . . . is in fur-
therance of a compelling governmental interest; and . . . is
the least restrictive means of furthering that compelling
governmental interest." §§2000bb–1(a)–(b).  Placing Con-
gress' intent beyond dispute, RFRA specifies that it "applies
to all Federal law, and the implementation of that law,
whether statutory or otherwise." §2000bb–3(a). RFRA also
permits Congress to exclude statutes from RFRA's protec-
tions.  §2000bb–3(b).

It is clear from the face of the statute that the contracep-
tive mandate is capable of violating RFRA.  The ACA does
not explicitly exempt RFRA, and the regulations imple-
menting the contraceptive mandate qualify as "Federal
law" or "the implementation of [Federal] law."  §2000bb–
3(a); cf. *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 297–298
(1979).  Additionally, we expressly stated in *Hobby Lobby*
that the contraceptive mandate violated RFRA as applied
to entities with complicity-based objections.  573 U. S., at
736. Thus, the potential for conflict between the contracep-
tive mandate and RFRA is well settled.  Against this back-
drop, it is unsurprising that RFRA would feature promi-
nently in the Departments' discussion of exemptions that
would not pose similar legal problems.

Moreover, our decisions all but instructed the Depart-
ments to consider RFRA going forward.  For instance,
though we held that the mandate violated RFRA in *Hobby
Lobby*, we left it to the Federal Government to develop and
implement a solution.  At the same time, we made it abun-
dantly clear that, under RFRA, the Departments must ac-
cept the sincerely held complicity-based objections of reli-
gious entities.  That is, they could not "tell the plaintiffs
that their beliefs are flawed" because, in the Departments'
view, "the connection between what the objecting parties

must do . . . and the end that they find to be morally wrong . . . is simply too attenuated." *Hobby Lobby*, 573 U. S., at 723–724. Likewise, though we did not decide whether the self-certification accommodation ran afoul of RFRA in *Zubik*, we directed the parties on remand to "accommodat[e]" the free exercise rights of those with complicity-based objections to the self-certification accommodation. 578 U. S., at \_\_\_ (slip op., at 4). It is hard to see how the Departments could promulgate rules consistent with these decisions if they did not overtly consider these entities' rights under RFRA.

This is especially true in light of the basic requirements of the rulemaking process. Our precedents require final rules to "articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (internal quotation marks omitted). This requirement allows courts to assess whether the agency has promulgated an arbitrary and capricious rule by "entirely fail[ing] to consider an important aspect of the problem [or] offer[ing] an explanation for its decision that runs counter to the evidence before [it]." *Ibid.*; see also *Department of Commerce* v. *New York*, 588 U. S. \_\_\_, \_\_\_–\_\_\_ (2019) (BREYER, J., concurring in part and dissenting in part) (slip op., at 3–4); *Genuine Parts Co.* v. *EPA*, 890 F. 3d 304, 307 (CADC 2018); *Pacific Coast Federation of Fishermen's Assns.* v. *United States Bur. of Reclamation*, 426 F. 3d 1082, 1094 (CA9 2005). Here, the Departments were aware that *Hobby Lobby* held the mandate unlawful as applied to religious entities with complicity-based objections. 82 Fed. Reg. 47799; 83 Fed. Reg. 57544–57545. They were also aware of *Zubik*'s instructions. 82 Fed. Reg. 47799. And, aside from our own decisions, the Departments were mindful of the RFRA concerns raised in "public comments and

. . . court filings in dozens of cases—encompassing hundreds of organizations." *Id.*, at 47802; see also *id.*, at 47806. If the Departments did not look to RFRA's requirements or discuss RFRA at all when formulating their solution, they would certainly be susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem.[12]  Thus, respondents' argument that the Departments erred by looking to RFRA as a guide when framing the religious exemption is without merit.

### III

Because we hold that the Departments had authority to promulgate the exemptions, we must next decide whether the 2018 final rules are procedurally invalid.  Respondents present two arguments on this score.  Neither is persuasive.

### A

Unless a statutory exception applies, the APA requires agencies to publish a notice of proposed rulemaking in the Federal Register before promulgating a rule that has legal force.  See 5 U. S. C. §553(b).  Respondents point to the fact that the 2018 final rules were preceded by a document entitled "Interim Final Rules with Request for Comments," not a document entitled "General Notice of Proposed Rulemaking."  They claim that since this was insufficient to satisfy §553(b)'s requirement, the final rules were procedurally invalid.  Respondents are incorrect.  Formal labels aside,

─────────────

[12] Here, too, the Departments have consistently taken the position that their rules had to account for RFRA in response to comments that the rules would violate that statute.  See Dept. of Labor, FAQs About Affordable Care Act Implementation Part 36, pp. 4–5 (2017) (2016 Request for Information); 78 Fed. Reg. 39886–39887 (2013 rule); 77 Fed. Reg. 8729 (2012 final rule).  As the 2017 IFR explained, the Departments simply reached a different conclusion on whether the accommodation satisfied RFRA.  See 82 Fed. Reg. 47800–40806 (summarizing the previous ways in which the Departments accounted for RFRA and providing a lengthy explanation for the changed position).

the rules contained all of the elements of a notice of proposed rulemaking as required by the APA.

The APA requires that the notice of proposed rulemaking contain "reference to the legal authority under which the rule is proposed" and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." §§553(b)(2)–(3). The request for comments in the 2017 IFRs readily satisfies these requirements. That request detailed the Departments' view that they had legal authority under the ACA to promulgate both exemptions, 82 Fed. Reg. 47794, 47844, as well as authority under RFRA to promulgate the religious exemption, *id.*, at 47800–47806. And respondents do not—and cannot—argue that the IFRs failed to air the relevant issues with sufficient detail for respondents to understand the Departments' position. See *supra*, at 10–11. Thus, the APA notice requirements were satisfied.

Even assuming that the APA requires an agency to publish a document entitled "notice of proposed rulemaking" when the agency moves from an IFR to a final rule, there was no "prejudicial error" here. §706. We have previously noted that the rule of prejudicial error is treated as an "administrative law . . . harmless error rule," *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 659–660 (2007) (internal quotation marks omitted). Here, the Departments issued an IFR that explained its position in fulsome detail and "provide[d] the public with an opportunity to comment on whether [the] regulations . . . should be made permanent or subject to modification." 82 Fed. Reg. 47815; see also *id.*, at 47852, 47855. Respondents thus do not come close to demonstrating that they experienced any harm from the title of the document, let alone that they have satisfied this harmless error rule. "The object [of notice and comment], in short, is one of fair notice," *Long Island Care at Home, Ltd.* v. *Coke*, 551 U. S. 158, 174 (2007), and respondents certainly had such notice here. Because

the IFR complied with the APA's requirements, this claim fails.[13]

B

Next, respondents contend that the 2018 final rules are procedurally invalid because "nothing in the record signal[s]" that the Departments "maintained an open mind throughout the [post-promulgation] process." Brief for Respondents 27. As evidence for this claim, respondents point to the fact that the final rules made only minor alterations to the IFRs, leaving their substance unchanged. The Third Circuit applied this "open-mindedness" test, concluding that because the final rules were "virtually identical" to the IFRs, the Departments lacked the requisite "flexible and open-minded attitude" when they promulgated the final rules. 930 F. 3d, at 569 (internal quotation marks omitted).

We decline to evaluate the final rules under the open-mindedness test. We have repeatedly stated that the text of the APA provides the "'maximum procedural requirements'" that an agency must follow in order to promulgate a rule. *Perez*, 575 U. S., at 100 (quoting *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 524 (1978)). Because the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness," *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 513 (2009), we have repeatedly rejected courts' attempts to impose "judge-made procedur[es]" in addition to the APA's mandates, *Perez*, 575 U. S., at 102; see also *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 654–655 (1990); *Vermont Yankee*, 435 U. S., at 549. And like the procedures that we have held invalid, the open-mindedness test violates the

---

[13] We note as well that the Departments promulgated many other IFRs in addition to the three related to the contraceptive mandate. See, *e.g.*, 75 Fed. Reg. 27122 (dependent coverage); *id.*, at 34538 (grandfathered health plans); *id.*, at 37188 (pre-existing conditions).

"general proposition that courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." *LTV Corp.*, 496 U. S., at 654. Rather than adopting this test, we focus our inquiry on whether the Departments satisfied the APA's objective criteria, just as we have in previous cases. We conclude that they did.

Section 553(b) obligated the Departments to provide adequate notice before promulgating a rule that has legal force. As explained *supra*, at 22–23, the IFRs provided sufficient notice. Aside from these notice requirements, the APA mandates that agencies "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," §553(c); states that the final rules must include "a concise general statement of their basis and purpose," *ibid.*; and requires that final rules must be published 30 days before they become effective, §553(d).

The Departments complied with each of these statutory procedures. They "request[ed] and encourag[ed] public comments on all matters addressed" in the rules—*i.e.*, the basis for the Departments' legal authority, the rationales for the exemptions, and the detailed discussion of the exemptions' scope. 82 Fed. Reg. 47813, 47854. They also gave interested parties 60 days to submit comments. *Id.*, at 47792, 47838. The final rules included a concise statement of their basis and purpose, explaining that the rules were "necessary to protect sincerely held" moral and religious objections and summarizing the legal analysis supporting the exemptions. 83 Fed. Reg. 57592; see also *id.*, at 57537–57538. Lastly, the final rules were published on November 15, 2018, but did not become effective until January 14, 2019—more than 30 days after being published. *Id.*, at 57536, 57592. In sum, the rules fully complied with "'the maximum procedural requirements [that] Congress was willing to have the courts impose upon agencies in conduct-

ing rulemaking procedures.'" *Perez*, 575 U. S., at 102 (quoting *Vermont Yankee*, 435 U. S., at 524). Accordingly, respondents' second procedural challenge also fails.[14]

\* \* \*

For over 150 years, the Little Sisters have engaged in faithful service and sacrifice, motivated by a religious calling to surrender all for the sake of their brother. "[T]hey commit to constantly living out a witness that proclaims the unique, inviolable dignity of every person, particularly those whom others regard as weak or worthless." Complaint ¶14. But for the past seven years, they—like many other religious objectors who have participated in the litigation and rulemakings leading up to today's decision—have had to fight for the ability to continue in their noble work without violating their sincerely held religious beliefs. After two decisions from this Court and multiple failed regulatory attempts, the Federal Government has arrived at a solution that exempts the Little Sisters from the source of their complicity-based concerns—the administratively imposed contraceptive mandate.

We hold today that the Departments had the statutory authority to craft that exemption, as well as the contemporaneously issued moral exemption. We further hold that the rules promulgating these exemptions are free from procedural defects. Therefore, we reverse the judgment of the Court of Appeals and remand the cases for further proceedings consistent with this opinion.

*It is so ordered.*

---

[14] Because we conclude that the IFRs' request for comment satisfies the APA's rulemaking requirements, we need not reach respondents' additional argument that the Departments lacked good cause to promulgate the 2017 IFRs.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–431 and 19–454

_____

LITTLE SISTERS OF THE POOR SAINTS PETER
AND PAUL HOME, PETITIONER
19–431 *v.*
PENNSYLVANIA, ET AL.


DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS
19–454 *v.*
PENNSYLVANIA, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[July 8, 2020]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins,
concurring.

In these cases, the Court of Appeals held, among other
things, (1) that the Little Sisters of the Poor lacked stand-
ing to appeal, (2) that the Affordable Care Act (ACA) does
not permit any exemptions from the so-called contraceptive
mandate, (3) that the Departments responsible for issuing
the challenged rule[1] violated the Administrative Procedure

_____

[1] The Health Resources and Services Administration (HRSA), a divi-
sion of the Department of Health and Human Services, creates the "com-
prehensive guidelines" on "coverage" for "additional preventive care and
screenings" for women, 42 U. S. C. §300gg–13(a)(4), but the statute is
jointly administered and enforced by the Departments of Health and Hu-
man Services, Labor, and Treasury (collectively Departments), see
§300gg–92; 29 U. S. C. §1191c; 26 U. S. C. §9833. The Departments
promulgated the exemptions at issue here, which were subsequently in-
corporated into the guidelines by HRSA. See 83 Fed. Reg. 57536 (2018);
*id.*, at 57592.

Act (APA) by failing to provide notice of proposed rulemak-
ing, and (4) that the final rule creating the current exemp-
tions is invalid because the Departments did not have an
open mind when they considered comments to the rule.
Based on this analysis, the Court of Appeals affirmed the
nationwide injunction issued by the District Court.

This Court now concludes that all the holdings listed
above were erroneous, and I join the opinion of the Court in
full.  We now send these cases back to the lower courts,
where the Commonwealth of Pennsylvania and the State of
New Jersey are all but certain to pursue their argument
that the current rule is flawed on yet another ground,
namely, that it is arbitrary and capricious and thus violates
the APA.  This will prolong the legal battle in which the
Little Sisters have now been engaged for seven years—even
though during all this time no employee of the Little Sisters
has come forward with an objection to the Little Sisters'
conduct.

I understand the Court's desire to decide no more than is
strictly necessary, but under the circumstances here, I
would decide one additional question: whether the Court of
Appeals erred in holding that the Religious Freedom Resto-
ration Act (RFRA), 42 U. S. C. §§2000bb–2000bb–4, does
not compel the religious exemption granted by the current
rule.  If RFRA requires this exemption, the Departments
did not act in an arbitrary and capricious manner in grant-
ing it.  And in my judgment, RFRA compels an exemption
for the Little Sisters and any other employer with a similar
objection to what has been called the accommodation to the
contraceptive mandate.

I

Because the contraceptive mandate has been repeatedly
modified, a brief recapitulation of this history may be help-
ful.  The ACA itself did not require that insurance plans

include coverage for contraceptives. Instead, the Act provided that plans must cover those preventive services found to be appropriate by the Health Resources and Services Administration (HRSA), an agency of the Department of Health and Human Services. 42 U. S. C. §300gg–13(a)(4). In 2011, HRSA recommended that plans be required to cover "'[a]ll . . . contraceptive methods'" approved by the Food and Drug Administration. 77 Fed. Reg. 8725 (2012). (I will use the term "contraceptive mandate" or simply "mandate" to refer to the obligation to provide coverage for contraceptives under any of the various regimes that have existed since the promulgation of this original rule.) At the direction of the relevant Departments, HRSA simultaneously created an exemption from the mandate for "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order." 76 Fed. Reg. 46623 (2011); see 77 Fed. Reg. 8726. (I will call this the "church exemption.") This narrow exemption was met with strong objections on the ground that it furnished insufficient protection for religious groups opposed to the use of some or all of the listed contraceptives.

The Departments responded by issuing a new regulation that created an accommodation for certain religious non-profit employers. See 78 Fed. Reg. 39892–39898 (2013). (I will call this the "accommodation.") Under this accommodation, a covered employer could certify its objection to its insurer (or, if its plan was self-funded, to its third-party plan administrator), and the insurer or third-party administrator would then proceed to provide contraceptive coverage to the objecting entity's employees. Unlike the earlier church exemption, the accommodation did not exempt these religious employers from the contraceptive mandate, but the Departments construed invocation of the accommodation as compliance with the mandate.

Meanwhile, the contraceptive mandate was challenged

by various employers who had religious objections to providing coverage for at least some of the listed contraceptives but were not covered by the church exemption or the accommodation. In *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682 (2014), we held that RFRA prohibited the application of the regulation to closely held, for-profit corporations that fell into this category. The Departments responded by issuing a new regulation that attempted to codify our holding by allowing closely-held corporations to utilize the accommodation. See 80 Fed. Reg. 41343–41347 (2015).[2]

Although this modification solved one RFRA problem, the contraceptive mandate was still objectionable to some religious employers, including the Little Sisters. We considered those objections in *Zubik* v. *Burwell*, 578 U. S. ___ (2016) (*per curiam*), but instead of resolving the legal dispute, we vacated the decisions below and remanded, instructing the parties to attempt to come to an agreement. Unfortunately, after strenuous efforts, the outgoing administration reported on January 9, 2017, that no reconciliation could be reached.[3] The Little Sisters and other employers objected to engaging in any conduct that had the effect of making contraceptives available to their employees under their insurance plans, and no way of providing such coverage to their employees without using their plans could be found.

———————

[2] In the regulation, the Departments also responded to our holding in *Wheaton College* v. *Burwell*, 573 U. S. 958 (2014), by allowing employers who invoked the accommodation to notify the Government of their objection, rather than filing the objection with their insurer or third-party administrator. See 80 Fed. Reg. 41337.

[3] Dept. of Labor, FAQs About Affordable Care Act Implementation Part 36 (Jan. 9, 2017), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

In 2017, the new administration took up the task of attempting to find a solution. After receiving more than 56,000 comments, it issued the rule now before us, which made the church exemption available to non-governmental employers who object to the provision of some or all contraceptive services based on sincerely held religious beliefs.[4] 45 CFR §147.132 (2019); see 83 Fed. Reg. 57540, 57590. (The "religious exemption.") The Court of Appeals, as noted, held that RFRA did not require this new rule.

## II

### A

RFRA broadly prohibits the Federal Government from violating religious liberty. See 42 U. S. C. §2000bb–1(a). It applies to every "branch, department, agency, [and] instrumentality" of the Federal Government, as well as any "person acting under the color of" federal law. §2000bb–2(1). And this prohibition applies to the "implementation" of federal law. §2000bb–3(a). Thus, unless the ACA or some other subsequently enacted statute made RFRA inapplicable to the contraceptive mandate, the Departments responsible for administering that mandate are obligated to do so in a manner that complies with RFRA.

No provision of the ACA abrogates RFRA, and our decision in *Hobby Lobby*, 573 U. S., at 736, established that application of the contraceptive mandate must conform to RFRA's demands. Thus, it was incumbent on the Departments to ensure that the rules implementing the mandate were consistent with RFRA, as interpreted in our decision.

### B

Under RFRA, the Federal Government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless it

---

[4]A similar exemption was provided for employers with moral objections. See 45 CFR §147.33.

"demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." §§2000bb–1(a)–(b). Applying RFRA to the contraceptive mandate thus presents three questions. First, would the mandate substantially burden an employer's exercise of religion? Second, if the mandate would impose such a burden, would it nevertheless serve a "compelling interest"? And third, if it serves such an interest, would it represent "the least restrictive means of furthering" that interest?

*Substantial burden.* Under our decision in *Hobby Lobby*, requiring the Little Sisters or any other employer with a similar religious objection to comply with the mandate would impose a substantial burden. Our analysis of this question in *Hobby Lobby* can be separated into two parts. First, would non-compliance have substantial adverse practical consequences? 573 U. S., at 720–723. Second, would compliance cause the objecting party to violate its religious beliefs, *as it sincerely understands them*? *Id.*, at 723–726.

The answer to the first question is indisputable. If a covered employer does not comply with the mandate (by providing contraceptive coverage or invoking the accommodation), it faces penalties of $100 per day for each of its employees. 26 U. S. C. §4980D(b)(1). "And if the employer decides to stop providing health insurance altogether and at least one full-time employee enrolls in a health plan and qualifies for a subsidy on one of the government-run ACA exchanges, the employer must pay $2,000 per year for each of its full-time employees. §§4980H(a), (c)(1)." 573 U. S., at 697. In *Hobby Lobby*, we found these "severe" financial consequences sufficient to show that the practical effect of non-compliance would be "substantial."[5] *Id.*, at 720.

---

[5] This is one of the differences between these cases and *Bowen* v. *Roy*,

Our answer to the second question was also perfectly clear. If an employer has a religious objection to the use of a covered contraceptive, and if the employer has a sincere religious belief that compliance with the mandate makes it complicit in that conduct, then RFRA requires that the belief be honored. *Id.*, at 724–725. We noted that the objection raised by the employers in *Hobby Lobby* "implicate[d] a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another." *Id.*, at 724. We noted that different individuals have different beliefs on this question, but we were clear that "federal courts have no business addressing . . . whether the religious belief asserted in a RFRA case is reasonable." *Ibid.* Instead, the "function" of a court is "'narrow'": "'to determine' whether the line drawn reflects 'an honest conviction.'" *Id.*, at 725 (quoting *Thomas* v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707, 716 (1981)).

Applying this holding to the Little Sisters yields an obvious answer. It is undisputed that the Little Sisters have a sincere religious objection to the use of contraceptives and that they also have a sincere religious belief that utilizing the accommodation would make them complicit in this conduct. As in *Hobby Lobby*, "it is not for us to say that their religious beliefs are mistaken or insubstantial." 573 U. S., at 725.

In reaching a contrary conclusion, the Court of Appeals adopted the reasoning of a prior Third Circuit decision hold-

---

476 U. S. 693 (1986). See *post*, at 18–19 (opinion of GINSBURG, J.) (relying on *Bowen* to conclude that accommodation was unnecessary). In *Bowen*, the objecting individuals were not faced with penalties or "coerced by the Governmen[t] into violating their religious beliefs." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 449 (1988).

ing that "'the submission of the self-certification form'" required by the mandate would not "'trigger or facilitate the provision of contraceptive coverage'" and would not make the Little Sisters "'"complicit" in the provision'" of objected-to services. 930 F. 3d 543, 573 (2019) (quoting *Geneva College* v. *Secretary of U. S. Dept. of Health and Human Servs.*, 778 F. 3d 422, 437–438 (CA3 2015), vacated and remanded *sub nom. Zubik*, 578 U. S. ___).

The position taken by the Third Circuit was similar to that of the Government when *Zubik* was before us. Opposing the position taken by the Little Sisters and others, the Government argued that what the accommodation required was not materially different from simply asking that an objecting party opt out of providing contraceptive coverage with the knowledge that by doing so it would cause a third party to provide that coverage. According to the Government, everything that occurred following the opt-out was a result of governmental action.[6]

Petitioners disagreed. Their concern was not with notifying the Government that they wished to be exempted from complying with the mandate *per se*,[7] but they objected to two requirements that they sincerely believe would make them complicit in conduct they find immoral. First, they took strong exception to the requirement that they maintain and pay for a plan under which coverage for contraceptives would be provided. As they explained, if they "were willing to incur ruinous penalties by dropping their health plans, their insurance companies would have no authority

—————

[6] See Brief for Respondents in *Zubik* v. *Burwell*, O. T. 2015, Nos. 14–1418, 14–1453, 14–1505, 15–35, 15–105, 15–119, 15–191, pp. 35–41.

[7] See Brief for Petitioners in *Zubik* v. *Burwell*, O. T. 2015, Nos. 15–35, 15–105, 15–119, 15–191, p. 45.

or obligation to provide or procure the objectionable coverage for [their] plan beneficiaries."[8]  Second, they also objected to submission of the self-certification form required by the accommodation because without that certification their plan could not be used to provide contraceptive coverage.[9]  At bottom, then, the Government and the religious objectors disagreed about the relationship between what the accommodation demanded and the provision of contraceptive coverage.

Our remand in *Zubik* put these two conflicting interpretations to the test.  In response to our request for supplemental briefing, petitioners explained their position in the following terms.  "[T]heir religious exercise" would not be "infringed" if they did not have to do anything "'more than contract for a plan that does not include coverage for some or all forms of contraception,' even if their employees receive[d] cost-free contraceptive coverage from the same insurance company."  578 U. S., at ___ (slip op., at 3).  At the time, the Government thought that it might be possible to achieve this result under the ACA, *ibid.*, but subsequent attempts to find a way to do this failed.  After great effort, the Government was forced to conclude that it was "not aware of the authority, or of a practical mechanism," for providing contraceptive coverage "specifically to persons covered by an objecting employer, other than by using the employer's plan, issuer, or third party administrator."  83 Fed. Reg. 57545–57546.

The inescapable bottom line is that the accommodation demanded that parties like the Little Sisters engage in conduct that was a necessary cause of the ultimate conduct to which they had strong religious objections.  Their situation was the same as that of the conscientious objector in

─────────
[8] Brief for Petitioners in *Zubik* v. *Burwell*, O. T. 2015, Nos. 14–1418, 14–1453, 14–1505, p. 49.

[9] Brief for Petitioners in *Zubik*, O. T. 2015, Nos. 15–35, 15–105, 15–119, 15–191, at 44.

*Thomas*, 450 U. S., at 715, who refused to participate in the manufacture of tanks but did not object to assisting in the production of steel used to make the tanks. Where to draw the line in a chain of causation that leads to objectionable conduct is a difficult moral question, and our cases have made it clear that courts cannot override the sincere religious beliefs of an objecting party on that question. See *Hobby Lobby*, 573 U. S., at 723–726; *Thomas*, 450 U. S., at 715–716.

For these reasons, the contraceptive mandate imposes a substantial burden on any employer who, like the Little Sisters, has a sincere religious objection to the use of a listed contraceptive and a sincere religious belief that compliance with the mandate (through the accommodation or otherwise) makes it complicit in the provision to the employer's workers of a contraceptive to which the employer has a religious objection.

*Compelling interest.* In *Hobby Lobby*, the Government asserted and we assumed for the sake of argument that the Government had a compelling interest in "ensuring that all women have access to all FDA-approved contraceptives without cost sharing." 573 U. S., at 727. Now, the Government concedes that it lacks a compelling interest in providing such access, Reply Brief in No. 19–454, p. 10, and this time, the Government is correct.

In order to show that it has a "compelling interest" within the meaning of RFRA, the Government must clear a high bar. In *Sherbert* v. *Verner*, 374 U. S. 398 (1963), the decision that provides the foundation for the rule codified in RFRA, we said that "'[o]nly the gravest abuses, endangering paramount interest'" could "'give occasion for [a] permissible limitation'" on the free exercise of religion. *Id.*, at 406. Thus, in order to establish that it has a "compelling interest" in providing free contraceptives to all women, the Government would have to show that it would commit one of "the gravest abuses" of its responsibilities if it did not

furnish free contraceptives to all women.

If we were required to exercise our own judgment on the question whether the Government has an obligation to provide free contraceptives to all women, we would have to take sides in the great national debate about whether the Government should provide free and comprehensive medical care for all. Entering that policy debate would be inconsistent with our proper role, and RFRA does not call on us to express a view on that issue. We can answer the compelling interest question simply by asking whether *Congress* has treated the provision of free contraceptives to all women as a compelling interest.

"'[A] law cannot be regarded as protecting an interest "of the highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 547 (1993). Thus, in considering whether Congress has manifested the view that it has a compelling interest in providing free contraceptives to all women, we must take into account "exceptions" to this asserted "'rule of general applicability.'" *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U. S. 418, 436 (2006) (quoting §2000bb–1(a)). And here, there are exceptions aplenty. The ACA—which fails to ensure that millions of women have access to free contraceptives—unmistakably shows that Congress, at least to date, has not regarded this interest as compelling.

First, the ACA does not provide contraceptive coverage for women who do not work outside the home. If Congress thought that there was a compelling need to make free contraceptives available for all women, why did it make no provision for women who do not receive a paycheck? Some of these women may have a greater need for free contraceptives than do women in the work force.

Second, if Congress thought that there was a compelling need to provide cost-free contraceptives for all working

women, why didn't Congress mandate that coverage in the ACA itself?  Why did it leave it to HRSA to decide whether to require such coverage *at all*?

Third, the ACA's very incomplete coverage speaks volumes.  The ACA "exempts a great many employers from most of its coverage requirements."  *Hobby Lobby*, 573 U. S., at 699.  "[E]mployers with fewer than 50 employees are not required to provide" any form of health insurance, and a number of large employers with "'grandfathered'" plans need not comply with the contraceptive mandate. *Ibid.*; see 26 U. S. C. §4980H(c)(2); 42 U. S. C. §18011.  According to a recent survey, 13% of the 153 million Americans with employer-sponsored health insurance are enrolled in a grandfathered plan, while only 56% of small firms provide health insurance.  Kaiser Family Foundation, Employer Health Benefits: 2019 Annual Survey 7, 44, 209 (2019).  In *Hobby Lobby*, we wrote that "the contraceptive mandate 'presently does not apply to tens of millions of people,'" 573 U. S., at 700, and it appears that this is still true apart from the religious exemption.[10]

Fourth, the Court's recognition in today's decision that the ACA authorizes the creation of exemptions that go beyond anything required by the Constitution provides further evidence that Congress did not regard the provision of cost-free contraceptives to all women as a compelling interest.

Moreover, the regulatory exemptions created by the Departments and HRSA undermine any claim that the agencies themselves viewed the provision of contraceptive coverage as sufficiently compelling.  From the outset, the church exemption has applied to churches, their integrated

---

[10] In contrast, the Departments estimated that plans covering 727,000 people would take advantage of the religious exemption, and thus that between 70,500 and 126,400 women of childbearing age would be affected by the religious exemption.  83 Fed. Reg. 57578, 57581.

auxiliaries, and associations. 76 Fed. Reg. 46623. And because of the way the accommodation operates under the Employee Retirement Income Security Act of 1974, the Departments treated a number of self-insured non-profit organizations established by churches or associations of churches, including religious universities and hospitals, as "effectively exempted" from the contraceptive mandate as well. Brief for Petitioners in No. 19–454, p. 4. The result was a complex and sometimes irrational pattern of exemptions.

The dissent frames the allegedly compelling interest served by the mandate in different terms—as an interest in providing "seamless" cost-free coverage, *post*, at 1, 14, 21 (opinion of GINSBURG, J.)—but this is an even weaker argument. What "seamless" coverage apparently means is coverage under the insurance plan furnished by a woman's employer. So as applied to the Little Sisters, the dissent thinks that it would be a grave abuse if an employee wishing to obtain contraceptives had to take any step that would not be necessary if she wanted to obtain any other medical service. See *post*, at 16–17. Apparently, it would not be enough if the Government sent her a special card that could be presented at a pharmacy to fill a prescription for contraceptives without any out-of-pocket expense. Nor would it be enough if she were informed that she could obtain free contraceptives by going to a conveniently located government clinic. Neither of those alternatives would provide "seamless coverage," and thus, according to the dissent, both would be insufficient. Nothing short of capitulation on the part of the Little Sisters would suffice.

This argument is inconsistent with any reasonable understanding of the concept of a "compelling interest." It is undoubtedly convenient for employees to obtain all types of medical care and all pharmaceuticals under their general health insurance plans, and perhaps there are women whose personal situation is such that taking any additional

steps to secure contraceptives would be a notable burden. But can it be said that all women or all working women have a compelling need for this convenience?

The ACA does not provide "seamless" coverage for all forms of medical care. Take the example of dental care. Although lack of dental care can cause great pain and may lead to serious health problems, the ACA does not require that a plan cover dental services. Millions of employees must secure separate dental insurance or pay dentist bills out of their own pockets.

In short, it is undoubtedly true that the contraceptive mandate provides a benefit that many women may find highly desirable, but Congress's enactments show that it has not regarded the provision of free contraceptives or the furnishing of "seamless" coverage as "compelling."

*Least restrictive means.* Even if the mandate served a compelling interest, the accommodation still would not satisfy the "exceptionally demanding" least-restrictive-means standard. *Hobby Lobby*, 573 U. S., at 728. To meet this standard, the Government must "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Ibid.*; see also *Holt* v. *Hobbs*, 574 U. S. 352, 365 (2015) ("'[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it'").

In *Hobby Lobby*, we observed that the Government has "other means" of providing cost-free contraceptives to women "without imposing a substantial burden on the exercise of religion by the objecting parties." 573 U. S., at 728. "The most straightforward way," we noted, "would be for the Government to assume the cost of providing the . . . contraceptives . . . to any women who are unable to obtain them under their health-insurance policies." *Ibid.* In the context of federal funding for health insurance, the cost of such a

program would be "minor." *Id.*, at 729.[11]

The Government argued that we should not take this option into account because it lacked statutory authority to create such a program, see *ibid.*, but we rejected that argument, *id.*, at 729–730. Certainly, Congress could create such a program if it thought that providing cost-free contraceptives to all women was a matter of "paramount" concern.

As the Government now points out, Congress has taken steps in this direction. "[E]xisting federal, state, and local programs," including Medicaid, Title X, and Temporary Assistance for Needy Families, already "provide free or subsidized contraceptives to low-income women." Brief for Petitioners in No. 19–454, at 27; see also 83 Fed. Reg. 57548, 57551 (discussing programs).[12]  And many women who

———————

[11] In 2019, the Government is estimated to have spent $737 billion subsidizing health insurance for individuals under the age of 65; $287 billion of that went to employment-related coverage. CBO, Federal Subsidies for Health Insurance for People Under Age 65: 2019 to 2029, pp. 15–16 (2019). While the cost of contraceptive methods varies, even assuming the most expensive options, which range around $1,000 a year, the cost of providing this coverage to the 126,400 women who are estimated to be impacted by the religious exemption would be $126.4 million. See Kosova, National Women's Health Network, How Much Do Different Kinds of Birth Control Cost Without Insurance? (Nov. 17, 2017), http:// nwhn.org/much-different-kinds-birth-control-cost-without-insurance/ (discussing contraceptive methods ranging from $240 to $1,000 per year); 83 Fed. Reg. 57581 (estimating that up to 126,400 women will be affected by the religious exemption).

[12] The Government recently amended the definitions for Title X's family planning program to help facilitate access to contraceptives for women who work for an employer invoking the religious and moral exemptions. See 84 Fed. Reg. 7734 (2019). These definitions now provide that "for the purpose of considering payment for contraceptive services only," a "low income family" "includes members of families whose annual income" would otherwise exceed the threshold "where a woman has health insurance coverage through an employer . . . [with] a sincerely held religious or moral objection to providing such [contraceptive] coverage." 42 CFR §59.2(2).

work for employers who have religious objections to the contraceptive mandate may be able to receive contraceptive coverage through a family member's health insurance plan.

In sum, the Departments were right to conclude that applying the accommodation to sincere religious objectors violates RFRA. See *id.*, at 57546. All three prongs of the RFRA analysis—substantial burden, compelling interest, and least restrictive means—necessitate this answer.

### III

Once it was apparent that the accommodation ran afoul of RFRA, the Government was required to eliminate the violation. RFRA does not specify the precise manner in which a violation must be remedied; it simply instructs the Government to avoid "substantially burden[ing]" the "exercise of religion"—*i.e.*, to eliminate the violation. §2000bb–1(a); see also §2000bb–1(c) (providing for "appropriate relief" in judicial suit). Thus, in *Hobby Lobby*, once we held that application of the mandate to the objecting parties violated RFRA, we left it to the Departments to decide how best to rectify this problem. See 573 U. S., at 736; 79 Fed. Reg. 51118 (2014) (proposing to modify the accommodation to extend it to closely held corporations in light of *Hobby Lobby*); 80 Fed. Reg. 41324 (final rule explaining that "[t]he Departments believe that the definition adopted in these regulations complies with and goes beyond what is required by RFRA and *Hobby Lobby*").

The same principle applies here. Once it is recognized that the prior accommodation violated RFRA in some of its applications, it was incumbent on the Departments to eliminate those violations, and they had discretion in crafting what they regarded as the best solution.

The solution they devised cures the problem, and it is not clear that any narrower exemption would have been sufficient with respect to parties with religious objections to the

accommodation. As noted, after great effort, the Government concluded that it was not possible to solve the problem without using an "employer's plan, issuer, or third party administrator." 83 Fed. Reg. 57546. As a result, the Departments turned to the current rule, under which an objecting party must certify that it "objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable)" either "[c]overage or payments for some or all contraceptive services" or "[a] plan, issuer, or third party administrator that provides or arranges such coverage or payments." 45 CFR §§147.132(a)(2)(i)–(ii).

The States take exception to the new religious rule on several grounds. First, they complain that it grants an exemption to some employers who were satisfied with the prior accommodation, but there is little basis for this argument. An employer who is satisfied with the accommodation may continue to operate under that regime. See §§147.131(c)–(d); 83 Fed. Reg. 57569–57571. And unless an employer has a religious objection to the accommodation, it is unclear why an employer would give it up. The accommodation does not impose any cost on an employer, and it provides an added benefit for the employer's work force.

The States also object to the new rule because it makes exemptions available to publicly traded corporations, but the Government is "not aware" of any publicly traded corporations that object to compliance with the mandate. *Id.*, at 57562. For all practical purposes, therefore, it is not clear that the new rule's provisions concerning entities that object to the mandate on religious grounds go any further than necessary to bring the mandate into compliance with RFRA.

In any event, while RFRA requires the Government to employ the least restrictive means of furthering a compelling interest that burdens religious belief, it does not re-

quire the converse—that an accommodation of religious be-
lief be narrowly tailored to further a compelling interest.
The latter approach, which is advocated by the States, gets
RFRA entirely backwards.  See Brief for Respondents 45
("RFRA could require the religious exemption only if it was
the least restrictive means of furthering [the Government's
compelling interest]").  Nothing in RFRA requires that
a violation be remedied by the narrowest permissible
corrective.

Needless to say, the remedy for a RFRA problem cannot
violate the Constitution, but the new rule does not have
that effect.  The Court has held that there is a constitutional
right to purchase and use contraceptives.  *Griswold* v. *Con-
necticut*, 381 U. S. 479 (1965); *Carey* v. *Population Services
Int'l*, 431 U. S. 678 (1977).  But the Court has never held
that there is a constitutional right to free contraceptives.

The dissent and the court below suggest that the new rule
is improper because it imposes burdens on the employees of
entities that the rule exempts, see *post*, at 14–17; 930 F. 3d,
at 573–574,[13] but the rule imposes no such burden.  A
woman who does not have the benefit of contraceptive cov-
erage under her employer's plan is not the victim of a bur-
den imposed by the rule or her employer.  She is simply not
the beneficiary of something that federal law does not pro-
vide.  She is in the same position as a woman who does not
work outside the home or a woman whose health insurance

---

[13] Both the dissent and the court below refer to the statement in *Cutter*
v. *Wilkinson*, 544 U. S. 709, 720 (2005), that "courts must take adequate
account of the burdens a requested accommodation may impose on non-
beneficiaries," but that statement was made in response to the argument
that RFRA's twin, the Religious Land Use and Institutionalized Persons
Act, 42 U. S. C. §2000cc *et seq.*, violated the Establishment Clause.  The
only case cited by *Cutter* in connection with this statement, *Estate of
Thornton v. Caldor, Inc.,* 472 U. S. 703 (1985), involved a religious ac-
commodation that the Court held violated the Establishment Clause.
Before this Court, the States do not argue—and there is no basis for an
argument—that the new rule violates that Clause.

ALITO, J., concurring

is provided by a grandfathered plan that does not pay for contraceptives or a woman who works for a small business that may not provide any health insurance at all.

\*    \*    \*

I would hold not only that it was appropriate for the Departments to consider RFRA, but also that the Departments were required by RFRA to create the religious exemption (or something very close to it). I would bring the Little Sisters' legal odyssey to an end.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 19–431 and 19–454

———————

LITTLE SISTERS OF THE POOR SAINTS PETER
AND PAUL HOME, PETITIONER
19–431          *v.*
PENNSYLVANIA, ET AL.


DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS
19–454          *v.*
PENNSYLVANIA, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[July 8, 2020]

JUSTICE KAGAN, with whom JUSTICE BREYER joins, concurring in the judgment.

I would uphold HRSA's statutory authority to exempt certain employers from the contraceptive-coverage mandate, but for different reasons than the Court gives. I also write separately because I question whether the exemptions can survive administrative law's demand for reasoned decisionmaking. That issue remains open for the lower courts to address.

The majority and dissent dispute the breadth of the delegation in the Women's Health Amendment to the ACA. The Amendment states that a health plan or insurer must offer coverage for "preventive care and screenings . . . as provided for in comprehensive guidelines supported by [HRSA] for purposes of this paragraph." 42 U. S. C. §300gg–13(a)(4). The disputed question is just what HRSA can "provide for." Both the majority and the dissent agree that

HRSA's guidelines can differentiate among preventive services, mandating coverage of some but not others. The opinions disagree about whether those guidelines can also differentiate among health plans, exempting some but not others from the contraceptive-coverage requirement. On that question, all the two opinions have in common is equal certainty they are right. Compare *ante,* at 16 (majority opinion) (Congress "enacted expansive language offer[ing] no indication whatever that the statute limits what HRSA can designate as preventive care and screenings or who must provide that coverage" (internal quotation marks omitted)), with *post,* at 9 (GINSBURG, J., dissenting) ("Nothing in [the statute] accord[s] HRSA authority" to decide "*who* must provide coverage" (internal quotation marks omitted; emphasis in original)).

Try as I might, I do not find that kind of clarity in the statute. Sometimes when I squint, I read the law as giving HRSA discretion over all coverage issues: The agency gets to decide who needs to provide what services to women. At other times, I see the statute as putting the agency in charge of only the "what" question, and not the "who." If I had to, I would of course decide which is the marginally better reading. But *Chevron* deference was built for cases like these. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984); see also *Arlington* v. *FCC*, 569 U. S. 290, 301 (2013) (holding that *Chevron* applies to questions about the scope of an agency's statutory authority). *Chevron* instructs that a court facing statutory ambiguity should accede to a reasonable interpretation by the implementing agency. The court should do so because the agency is the more politically accountable actor. See 467 U. S., at 865–866. And it should do so because the agency's expertise often enables a sounder assessment of which reading best fits the statutory scheme. See *id.,* at 865.

Here, the Departments have adopted the majority's reading of the statutory delegation ever since its enactment. Over the course of two administrations, the Departments have shifted positions on many questions involving the Women's Health Amendment and the ACA more broadly. But not on whether the Amendment gives HRSA the ability to create exemptions to the contraceptive-coverage mandate. HRSA adopted the original church exemption on the same capacious understanding of its statutory authority as the Departments endorse today. See 76 Fed. Reg. 46623 (2011) ("In the Departments' view, it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required").[1] While the exemption itself has expanded, the Departments' reading of the statutory delegation—that the law gives HRSA discretion over the "who" question—has remained the same. I would defer to that longstanding and reasonable interpretation.

But that does not mean the Departments should prevail when these cases return to the lower courts. The States challenged the exemptions not only as outside HRSA's statutory authority, but also as "arbitrary [and] capricious." 5

---

[1] The First Amendment cannot have separately justified the church exemption, as the dissent suggests. See *post*, at 12–13 (opinion of GINSBURG, J.). That exemption enables a religious institution to decline to provide contraceptive coverage to *all* its employees, from a minister to a building custodian. By contrast, the so-called ministerial exception of the First Amendment (which the dissent cites, see *post*, at 13) extends only to *select* employees, having ministerial status. See *Our Lady of Guadalupe School* v. *Morrissey-Berru*, 591 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 14–16); *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 190 (2012). (Too, this Court has applied the ministerial exception only to protect religious institutions from employment discrimination suits, expressly reserving whether the exception excuses their non-compliance with other laws. See *id.*, at 196.) And there is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation.

U. S. C. §706(2)(A).  Because the courts below found for the
States on the first question, they declined to reach the sec-
ond.  That issue is now ready for resolution, unaffected by
today's decision.  An agency acting within its sphere of del-
egated authority can of course flunk the test of "reasoned
decisionmaking."  *Michigan* v. *EPA*, 576 U. S. 743, 750
(2015).  The agency does so when it has not given "a satis-
factory explanation for its action"—when it has failed to
draw a "rational connection" between the problem it has
identified and the solution it has chosen, or when its
thought process reveals "a clear error of judgment."  *Motor
Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut.
Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (internal quo-
tation marks omitted).  Assessed against that standard of
reasonableness, the exemptions HRSA and the Depart-
ments issued give every appearance of coming up short.[2]

Most striking is a mismatch between the scope of the re-
ligious exemption and the problem the agencies set out to
address.  In the Departments' view, the exemption was
"necessary to expand the protections" for "certain entities
and individuals" with "religious objections" to contracep-
tion.  83 Fed. Reg. 57537 (2018).  Recall that under the old
system, an employer objecting to the contraceptive mandate
for religious reasons could avail itself of the "self-certifica-
tion accommodation."  *Ante,* at 6.  Upon making the certifi-
cation, the employer no longer had "to contract, arrange,
[or] pay" for contraceptive coverage; instead, its insurer
would bear the services' cost.  78 Fed. Reg. 39874 (2013).
That device dispelled some employers' objections—but not
all.  The Little Sisters, among others, maintained that the
accommodation itself made them complicit in providing
contraception.  The measure thus failed to "assuage[]" their

––––––––––
[2] I speak here only of the substantive validity of the exemptions.  I
agree with the Court that the final rules issuing the exemptions were
procedurally valid.

"sincere religious objections." 82 Fed. Reg. 47799 (2017). Given that fact, the Departments might have chosen to exempt the Little Sisters and other still-objecting groups from the mandate. But the Departments went further still. Their rule exempted all employers with objections to the mandate, even if the accommodation met their religious needs. In other words, the Departments exempted employers who had no religious objection to the status quo (because they did not share the Little Sisters' views about complicity). The rule thus went beyond what the Departments' justification supported—raising doubts about whether the solution lacks a "rational connection" to the problem described. *State Farm*, 463 U. S., at 43.[3]

And the rule's overbreadth causes serious harm, by the Departments' own lights. In issuing the rule, the Departments chose to retain the contraceptive mandate itself. See 83 Fed. Reg. 57537. Rather than dispute HRSA's prior finding that the mandate is "necessary for women's health and well-being," the Departments left that determination in place. HRSA, Women's Preventive Services Guidelines (Dec. 2019), www.hrsa.gov/womens-guidelines-2019; see 83 Fed. Reg. 57537. The Departments thus committed themselves to minimizing the impact on contraceptive coverage,

---

[3] At oral argument, the Solicitor General argued that the rule's overinclusion is harmless because the accommodation remains available to all employers who qualify for the exemption. See Tr. of Oral Arg. 20–23. But in their final rule, the Departments themselves acknowledged the prospect that some employers without a religious objection to the accommodation would switch to the exemption. See 83 Fed. Reg. 57576–57577 ("Of course, some of the[] religious" institutions that "do not conscientiously oppose participating" in the accommodation "may opt for the expanded exemption[,] but others might not"); *id.,* at 57561 ("[I]t is not clear to the Departments" how many of the religious employers who had used the accommodation without objection "will choose to use the expanded exemption instead"). And the Solicitor General, when pressed at argument, could offer no evidence that, since the rule took effect, employers without the Little Sisters' complicity beliefs had declined to avail themselves of the new exemption. Tr. of Oral Arg. 22.

even as they sought to protect employers with continuing religious objections.  But they failed to fulfill that commitment to women.  Remember that the accommodation preserves employees' access to cost-free contraceptive coverage, while the exemption does not.  See *ante,* at 5–6.  So the Departments (again, according to their own priorities) should have exempted only employers who had religious objections to the accommodation—not those who viewed it as a religiously acceptable device for complying with the mandate.  The Departments' contrary decision to extend the exemption to those without any religious need for it yielded all costs and no benefits.  Once again, that outcome is hard to see as consistent with reasoned judgment.  See *State Farm*, 463 U. S., at 43.[4]

Other aspects of the Departments' handiwork may also prove arbitrary and capricious.  For example, the Departments allow even publicly traded corporations to claim a religious exemption.  See 83 Fed. Reg. 57562–57563.  That option is unusual enough to raise a serious question about whether the Departments adequately supported their choice.  Cf. *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 717 (2014) (noting the oddity of "a publicly traded corporation asserting RFRA rights").  Similarly, the Departments offer an exemption to employers who have moral, rather than religious, objections to the contraceptive mandate.  Perhaps there are sufficient reasons for that decision—for example, a desire to stay neutral between religion and non-religion.  See 83 Fed. Reg. 57603–57604.  But

----

[4] In a brief passage in the interim final rule, the Departments suggested that an exemption is "more workable" than the accommodation in addressing religious objections to the mandate.  82 Fed. Reg. 47806.  But the Departments continue to provide the accommodation to any religious employers who request that option, thus maintaining a two-track system.  See *ante,* at 10; n. 3, *supra.*  So ease of administration cannot support, at least without more explanation, the Departments' decision to offer the exemption more broadly than needed.

RFRA cast a long shadow over the Departments' rulemaking, see *ante,* at 19–22, and that statute does not apply to those with only moral scruples. So a careful agency would have weighed anew, in this different context, the benefits of exempting more employers from the mandate against the harms of depriving more women of contraceptive coverage. In the absence of such a reassessment, it seems a close call whether the moral exemption can survive.

None of this is to say that the Departments could not issue a valid rule expanding exemptions from the contraceptive mandate. As noted earlier, I would defer to the Departments' view of the scope of Congress's delegation. See *supra,* at 3. That means the Departments (assuming they act hand-in-hand with HRSA) have wide latitude over exemptions, so long as they satisfy the requirements of reasoned decisionmaking. But that "so long as" is hardly nothing. Even in an area of broad statutory authority—maybe especially there—agencies must rationally account for their judgments.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 19–431 and 19–454

———————

LITTLE SISTERS OF THE POOR SAINTS PETER
AND PAUL HOME, PETITIONER
19–431　　　　　　　　*v.*
PENNSYLVANIA, ET AL.


DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS
19–454　　　　　　　　*v.*
PENNSYLVANIA, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[July 8, 2020]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR joins, dissenting.

In accommodating claims of religious freedom, this Court has taken a balanced approach, one that does not allow the religious beliefs of some to overwhelm the rights and interests of others who do not share those beliefs. See, *e.g.*, *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703, 708–710 (1985); *United States* v. *Lee*, 455 U. S. 252, 258–260 (1982). Today, for the first time, the Court casts totally aside countervailing rights and interests in its zeal to secure religious rights to the $n$th degree. Specifically, in the Women's Health Amendment to the Patient Protection and Affordable Care Act (ACA), 124 Stat. 119; 155 Cong. Rec. 28841 (2009), Congress undertook to afford gainfully employed women comprehensive, seamless, no-cost insurance coverage for preventive care protective of their health and well-being. Congress delegated to a particular agency, the

Health Resources and Services Administration (HRSA), authority to designate the preventive care insurance should cover. HRSA included in its designation all contraceptives approved by the Food and Drug Administration (FDA).

Destructive of the Women's Health Amendment, this Court leaves women workers to fend for themselves, to seek contraceptive coverage from sources other than their employer's insurer, and, absent another available source of funding, to pay for contraceptive services out of their own pockets. The Constitution's Free Exercise Clause, all agree, does not call for that imbalanced result.[1] Nor does the Religious Freedom Restoration Act of 1993 (RFRA), 42 U. S. C. §2000bb *et seq.*, condone harm to third parties occasioned by entire disregard of their needs. I therefore dissent from the Court's judgment, under which, as the Government estimates, between 70,500 and 126,400 women would immediately lose access to no-cost contraceptive services. On the merits, I would affirm the judgment of the U. S. Court of Appeals for the Third Circuit.

I

A

Under the ACA, an employer-sponsored "group health plan" must cover specified "preventive health services" without "cost sharing," 42 U. S. C. §300gg–13, *i.e.*, without

---

[1] In *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), the Court explained that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.,* at 879 (internal quotation marks omitted). The requirement that insurers cover FDA-approved methods of contraception "applies generally, . . . trains on women's well-being, not on the exercise of religion, and any effect it has on such exercise is incidental." *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 745 (2014) (GINSBURG, J., dissenting). *Smith* forecloses "[a]ny First Amendment Free Exercise Clause claim [one] might assert" in opposition to that requirement. 573 U. S., at 744.

such out-of-pocket costs as copays or deductibles.[2]  Those
enumerated services did not, in the original draft bill, in-
clude preventive care specific to women.  "To correct this
oversight, Senator Barbara Mikulski introduced the
Women's Health Amendment," now codified at §300gg–
13(a)(4). *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682,
741 (2014) (GINSBURG, J., dissenting); see also 155 Cong.
Rec. 28841.  This provision was designed "to promote equal-
ity in women's access to health care," countering gender-
based discrimination and disparities in such access.  Brief
for 186 Members of the United States Congress as *Amici
Curiae* 6 (hereinafter Brief for 186 Members of Congress).
Its proponents noted, *inter alia*, that "[w]omen paid signifi-
cantly more than men for preventive care," and that "cost
barriers operated to block many women from obtaining
needed care at all."   *Hobby Lobby*, 573 U. S., at 742
(GINSBURG, J., dissenting); see, *e.g.*, 155 Cong. Rec. 28844
(statement of Sen. Hagan) ("When . . . women had to choose
between feeding their children, paying the rent, and meet-
ing other financial obligations, they skipped important pre-
ventive screenings and took a chance with their personal
health.").

Due to the Women's Health Amendment, the preventive
health services that group health plans must cover include,
"with respect to women," "preventive care and screenings
. . . provided for in comprehensive guidelines supported by

──────────

[2] This requirement does not apply to employers with fewer than 50 em-
ployees, 26 U. S. C. §4980H(c)(2), or "grandfathered health plans"—
plans in existence on March 23, 2010 that have not thereafter made spec-
ified changes in coverage, 42 U. S. C. §18011(a), (e); 45 CFR §147.140(g)
(2018). "Federal statutes often include exemptions for small employers,
and such provisions have never been held to undermine the interests
served by these statutes." *Hobby Lobby*, 573 U. S., at 763 (GINSBURG, J.,
dissenting).  "[T]he grandfathering provision," "far from ranking as a
categorical exemption, . . . is temporary, intended to be a means for grad-
ually transitioning employers into mandatory coverage."  *Id.*, at 764
(internal quotation marks omitted).

[HRSA].” §300gg–13(a)(4). Pursuant to this instruction, HRSA undertook, after consulting the Institute of Medicine,[3] to state “what preventive services are necessary for women’s health and well-being and therefore should be considered in the development of comprehensive guidelines for preventive services for women.”[4] The resulting “Women’s Preventive Services Guidelines” issued in August 2011.[5] Under these guidelines, millions of women who previously had no, or poor quality, health insurance gained cost-free access, not only to contraceptive services but as well to, *inter alia,* annual checkups and screenings for breast cancer, cervical cancer, postpartum depression, and gestational diabetes.[6] As to contraceptive services, HRSA directed that, to implement §300gg–13(a)(4), women’s preventive services encompass “all [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.”[7]

Ready access to contraceptives and other preventive measures for which Congress set the stage in §300gg–13(a)(4) both safeguards women’s health and enables

––––––––––

[3] “The [Institute of Medicine] is an arm of the National Academy of Sciences, an organization Congress established for the explicit purpose of furnishing advice to the Government.” *Id.*, at 742, n. 3 (internal quotation marks omitted).

[4] HRSA, U. S. Dept. of Health and Human Services (HHS), Women’s Preventive Services Guidelines, www.hrsa.gov/womens-guidelines/ index.html.

[5] 77 Fed. Reg. 8725 (2012).

[6] HRSA, HHS, Women’s Preventive Services Guidelines, *supra.*

[7] 77 Fed. Reg. 8725 (alterations and internal quotation marks omitted). Proponents of the Women’s Health Amendment specifically anticipated that HRSA would require coverage of family planning services. See, *e.g.*, 155 Cong. Rec. 28841 (2009) (statement of Sen. Boxer); *id.*, at 28843 (statement of Sen. Gillibrand); *id.*, at 28844 (statement of Sen. Mikulski); *id.*, at 28869 (statement of Sen. Franken); *id.*, at 28876 (statement of Sen. Cardin); *ibid.* (statement of Sen. Feinstein); *id.*, at 29307 (statement of Sen. Murray).

women to chart their own life's course. Effective contraception, it bears particular emphasis, "improves health outcomes for women and [their] children," as "women with unintended pregnancies are more likely to receive delayed or no prenatal care" than women with planned pregnancies. Brief for 186 Members of Congress 5 (internal quotation marks omitted); Brief for American College of Obstetricians and Gynecologists et al. as *Amici Curiae* 10 (hereinafter ACOG Brief) (similar). Contraception is also "critical for individuals with underlying medical conditions that would be further complicated by pregnancy," "has . . . health benefits unrelated to preventing pregnancy," (*e.g.*, it can reduce the risk of endometrial and ovarian cancer), Brief for National Women's Law Center et al. as *Amici Curiae* 23–24, 26 (hereinafter NWLC Brief), and "improves women's social and economic status," by "allow[ing] [them] to invest in higher education and a career with far less risk of an unplanned pregnancy," Brief for 186 Members of Congress 5–6 (internal quotation marks omitted).

## B

For six years, the Government took care to protect women employees' access to critical preventive health services while accommodating the diversity of religious opinion on contraception. The Internal Revenue Service (IRS), the Employee Benefits Security Administration (EBSA), and the Center for Medicare and Medicaid Services (CMS) crafted a narrow exemption relieving houses of worship, "their integrated auxiliaries," "conventions or associations of churches," and "religious order[s]" from the contraceptive-coverage requirement. 76 Fed. Reg. 46623 (2011). For other nonprofit and closely held for-profit organizations opposed to contraception on religious grounds, the agencies made available an accommodation rather than an exemption. See 78 Fed. Reg. 39874 (2013); *Hobby Lobby*, 573 U. S., at 730–731.

"Under th[e] accommodation, [an employer] can self-certify that it opposes providing coverage for particular contraceptive services.  See 45 CFR §§147.131(b)(4), (c)(1) [(2013)]; 26 CFR §§54.9815–2713A(a)(4), (b).  If [an employer] makes such a certification, the [employer's] insurance issuer or third-party administrator must '[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan' and '[p]rovide separate payments for any contraceptive services required to be covered' without imposing 'any cost-sharing requirements . . . on the [employer], the group health plan, or plan participants or beneficiaries.' 45 CFR §147.131(c)(2); 26 CFR §54.9815–2713A(c)(2)."  *Id.*, at 731 (some alterations in original).[8]

The self-certification accommodation, the Court observed in *Hobby Lobby*, "does not impinge on [an employer's] belief that providing insurance coverage for . . . contraceptives . . . violates [its] religion."  *Ibid.*  It serves "a Government interest of the highest order," *i.e.*, providing women employees "with cost-free access to all FDA-approved methods of contraception."  *Id.*, at 729.  And "it serves [that] stated interes[t] . . . well."  *Id.*, at 731; see *id.,* at 693 (Government properly accommodated employer's religion-based objection to covering contraceptives under employer's health insurance plan when the harm to women of doing so "would be precisely zero").  Since the ACA's passage, "[gainfully employed] [w]omen, particularly in lower-income groups, have reported greater affordability of coverage, access to health

---

[8]This opinion refers to the contraceptive-coverage accommodation made in 2013 as the "self-certification accommodation."  See *ante*, at 6 (opinion of the Court).  Although this arrangement "requires the issuer to bear the cost of [contraceptive] services, HHS has determined that th[e] obligation will not impose any net expense on issuers because its cost will be less than or equal to the cost savings resulting from th[ose] services."  *Hobby Lobby*, 573 U. S., at 698–699.

care, and receipt of preventive services." Brief for 186 Members of Congress 21.

## C

Religious employers, including petitioner Little Sisters of the Poor Saints Peter and Paul Home (Little Sisters), nonetheless urge that the self-certification accommodation renders them "complicit in providing [contraceptive] coverage to which they sincerely object." Brief for Little Sisters 35. In 2017, responsive to the pleas of such employers, the Government abandoned its effort to both end discrimination against employed women in access to preventive services and accommodate religious exercise. Under new rules drafted not by HRSA, but by the IRS, EBSA, and CMS, *any* "non-governmental employer"—even a publicly traded for-profit company—can avail itself of the religious exemption previously reserved for houses of worship. 82 Fed. Reg. 47792 (2017) (interim final rule); 45 CFR §147.132(a)(1)(i)(E) (2018).[9] More than 2.9 million Americans—including approximately 580,000 women of childbearing age—receive insurance through organizations newly eligible for this blanket exemption. 83 Fed. Reg. 57577–57578 (2018). Of cardinal significance, the exemption contains no alternative mechanism to ensure affected women's continued access to contraceptive coverage. See 45 CFR §147.132.

Pennsylvania and New Jersey, respondents here, sued to enjoin the exemption. Their lawsuit posed this core question: May the Government jettison an arrangement that promotes women workers' well-being while accommodating employers' religious tenets and, instead, defer entirely to

---

[9] Nonprofit and closely held for-profit organizations with "sincerely held moral convictions" against contraception also qualify for the exemption. 45 CFR §147.133(a)(1)(i), (a)(2). Unless otherwise noted, this opinion refers to the religious and moral exemptions together as "the exemption" or "the blanket exemption."

employers' religious beliefs, although that course harms women who do not share those beliefs? The District Court answered "no," and preliminarily enjoined the blanket exemption nationwide. 281 F. Supp. 3d 553, 585 (ED Pa. 2017). The Court of Appeals affirmed. 930 F. 3d 543, 576 (CA3 2019). The same question is now presented for ultimate decision by this Court.

## II

Despite Congress' endeavor, in the Women's Health Amendment to the ACA, to redress discrimination against women in the provision of healthcare, the exemption the Court today approves would leave many employed women just where they were before insurance issuers were obliged to cover preventive services for them, cost free. The Government urges that the ACA itself authorizes this result, by delegating to HRSA authority to exempt employers from the contraceptive-coverage requirement. This argument gains the Court's approbation. It should not.

## A

I begin with the statute's text. But see *ante*, at 17 (opinion of the Court) (overlooking my starting place). The ACA's preventive-care provision, 42 U. S. C. §300gg–13(a), reads in full:

> "A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—
> "(1) evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force;
> "(2) immunizations that have in effect a recommendation from the Advisory Committee on Immunization

Practices of the Centers for Disease Control and Prevention with respect to the individual involved; . . .

"(3) with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by [HRSA; and]

"(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by [HRSA] for purposes of this paragraph."

At the start of this provision, Congress instructed who is to "provide coverage for" the specified preventive health services: "group health plan[s]" and "health insurance issuer[s]." §300gg–13(a). As the Court of Appeals explained, paragraph (a)(4), added by the Women's Health Amendment, granted HRSA "authority to issue 'comprehensive guidelines' concern[ing] the *type* of services" group health plans and health insurance issuers must cover with respect to women. 930 F. 3d, at 570 (emphasis added). Nothing in paragraph (a)(4) accorded HRSA "authority to undermine Congress's [initial] directive," stated in subsection (a), "concerning *who* must provide coverage for these services." *Ibid.* (emphasis added).

The Government argues otherwise, asserting that "[t]he sweeping authorization for HRSA to 'provide[] for' and 'support[]' guidelines 'for purposes of ' the women's preventive-services mandate clearly grants HRSA the power not just to specify what services should be covered, but also to provide appropriate exemptions." Brief for HHS et al. 15.[10] This terse statement—the entirety of the Government's textual case—slights the language Congress employed. Most visibly, the Government does not endeavor to explain how

––––––––––
[10] This opinion uses "Brief for HHS et al." to refer to the Brief for Petitioners in No. 19–454, filed on behalf of the Departments of HHS, Treasury, and Labor, the Secretaries of those Departments, and the President.

any language in paragraph (a)(4) counteracts Congress'
opening instruction in §300gg–13(a) that group health
plans "shall . . . provide" specified services. See *supra*, at
8–9.

The Court embraces, and the opinion concurring in the
judgment adopts, the Government's argument. The Court
correctly acknowledges that HRSA has broad discretion to
determine *what* preventive services insurers should pro-
vide for women. *Ante*, at 15. But it restates that HRSA's
"discretion [is] equally unchecked in other areas, including
the ability to identify and create exemptions from its own
Guidelines." *Ante*, at 16. See also *ante*, at 2–3 (KAGAN, J.,
concurring in judgment) (agreeing with this interpreta-
tion). Like the Government, the Court and the opinion con-
curring in the judgment shut from sight §300gg–13(a)'s
overarching direction that group health plans and health
insurance issuers "shall" cover the specified services. See
*supra*, at 8–9. That "'absent provision[s] cannot be supplied
by the courts,'" *ante*, at 16 (quoting *Rotkiske* v. *Klemm*, 589
U. S. ___, ___ (2019) (slip op., at 5), militates *against* the
Court's conclusion, not in favor of it. Where Congress
wanted to exempt certain employers from the ACA's re-
quirements, it said so expressly. See, *e.g.*, *supra,* at 3, n. 2.
Section 300gg–13(a)(4) includes no such exemption. See
*supra*, at 8–9.[11]

B

The position advocated by the Government and endorsed
by the Court and the opinion concurring in the judgment
encounters further obstacles.

Most saliently, the language in §300gg–13(a)(4) mirrors

_____

[11] The only language to which the Court points in support of its con-
trary conclusion is the phrase "as provided for." See *ante*, at 15. This
phrase modifies "additional preventive care and screenings." §300gg–
13(a)(4). It therefore speaks to *what* services shall be provided, not *who*
must provide them.

that in §300gg–13(a)(3), the provision addressing *children's* preventive health services. Not contesting here that HRSA lacks authority to exempt group health plans from the children's preventive-care guidelines, the Government attempts to distinguish paragraph (a)(3) from paragraph (a)(4). Brief for HHS et al. 16–17. The attempt does not withstand inspection.

The Government first observes that (a)(4), unlike (a)(3), contemplates guidelines created "*for purposes of this paragraph*." (Emphasis added.) This language does not speak to the scope of the guidelines HRSA is charged to create. Moreover, the Government itself accounts for this textual difference: The children's preventive-care guidelines described in paragraph (a)(3) were "preexisting guidelines . . . developed for purposes unrelated to the ACA." Brief for HHS et al. 16. The guidelines on women's preventive care, by contrast, did not exist before the ACA; they had to be created "for purposes of" the preventive-care mandate. §300gg–13(a)(4). The Government next points to the modifier "evidence-informed" placed in (a)(3), but absent in (a)(4). This omission, however it may bear on the kind of preventive services for women HRSA can require group health insurance to cover, does not touch or concern *who* is required to cover those services.[12]

HRSA's role within HHS also tugs against the Government's, the Court's, and the opinion concurring in the judgment's construction of §300gg–13(a)(4). That agency was a logical choice to determine *what* women's preventive services should be covered, as its mission is to "improve health care access" and "eliminate health disparities."[13] First and foremost, §300gg–13(a)(4) is directed at eradicating gender-

―――――――

[12] The Court does not say whether, in its view, the exemption authority it claims for women's preventive care exists as well for HRSA's children's preventive-care guidelines.

[13] HRSA, HHS, Organization, www.hrsa.gov/about/organization/index.html.

based disparities in access to preventive care. See *supra*, at 3. Overlooked by the Court, see *ante,* at 14–18, and the opinion concurring in the judgment, see *ante*, at 2–3 (opinion of KAGAN, J.), HRSA's expertise does not include any proficiency in delineating religious and moral exemptions. One would not, therefore, expect Congress to delegate to HRSA the task of crafting such exemptions. See *King* v. *Burwell*, 576 U. S. 473, 486 (2015) ("It is especially unlikely that Congress would have delegated this decision to [an agency] which has no expertise in . . . policy of this sort.").[14]

In fact, HRSA *did not* craft the blanket exemption. As earlier observed, see *supra*, at 7, that task was undertaken by the IRS, EBSA, and CMS. See also 45 CFR §147.132(a)(1), 147.133(a)(1) (direction by the IRS, EBSA, and CMS that HRSA's guidelines "*must not* provide for" contraceptive coverage in the circumstances described in the blanket exemption (emphasis added)). Nowhere in 42 U. S. C. §300gg–13(a)(4) are those agencies named, as earlier observed, see *supra,* at 8–9, an absence the Government, the Court, and the opinion concurring in the judgment do not deign to acknowledge. See Brief for HHS et al. 15–20; *ante*, at 14–18 (opinion of the Court); *ante*, at 2–3 (opinion of KAGAN, J.).

C

If the ACA does not authorize the blanket exemption, the Government urges, then the exemption granted to houses of worship in 2011 must also be invalid. Brief for HHS et al. 19–20. As the Court of Appeals explained, however, see 930

---

[14] A more logical choice would have been HHS's Office for Civil Rights (OCR), which "enforces . . . conscience and religious freedom laws" with respect to HHS programs. HHS, OCR, About Us, www.hhs.gov/ocr/about-us/index.html. Indeed, when the Senate introduced an amendment to the ACA similar in character to the blanket exemption, a measure that failed to pass, the Senate instructed that OCR administer the exemption. 158 Cong. Rec. 1415 (2012) (proposed amendment); *id*., at 2634 (vote tabling amendment).

F. 3d, at 570, n. 26, the latter exemption is not attributable to the ACA's text; it was justified on First Amendment grounds. See *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 188 (2012) (the First Amendment's "ministerial exception" protects "the internal governance of [a] church"); 80 Fed. Reg. 41325 (2015) (the exemption "recogni[zes] [the] particular sphere of autonomy [afforded to] houses of worship . . . consistent with their special status under longstanding tradition in our society").[15] Even if the house-of-worship exemption extends beyond what the First Amendment would require, see *ante*, at 3, n. 1 (opinion of KAGAN, J.), that extension, as just explained, cannot be extracted from the ACA's text.[16]

## III

Because I conclude that the blanket exemption gains no aid from the ACA, I turn to the Government's alternative argument. The *religious* exemption, if not the moral exemption, the Government urges, is necessary to protect religious freedom. The Government does not press a free exercise argument, see *supra*, at 2, and n. 1, instead invoking RFRA. Brief for HHS et al. 20–31. That statute instructs that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a

––––––––––

[15] On the broad scope the Court today attributes to the "ministerial exception," see *Our Lady of Guadalupe School* v. *Morrissey-Berru*, 591 U. S. \_\_\_ (2020).

[16] The Government does not argue that my view of the limited compass of §300gg–13(a)(4) imperils the self-certification accommodation. Brief for HHS et al. 19–20. But see *ante*, at 18, n. 9 (opinion of the Court). That accommodation aligns with the Court's decisions under the Religious Freedom Restoration Act of 1993 (RFRA). See *infra*, at 14–15. It strikes a balance between women's health and religious opposition to contraception, preserving women's access to seamless, no-cost contraceptive coverage, but imposing the obligation to provide such coverage directly on insurers, rather than on the objecting employer. See *supra*, at 6; *infra*, at 18–20. The blanket exemption, in contrast, entirely disregards women employees' preventive care needs.

rule of general applicability," unless doing so "is the least restrictive means of furthering [a] compelling governmental interest."  42 U. S. C. §2000bb–1(a), (b).

## A

### 1

The parties here agree that federal agencies may craft accommodations and exemptions to cure violations of RFRA. See, *e.g.*, Brief for Respondents 36.[17]  But that authority is not unbounded.  *Cutter* v. *Wilkinson*, 544 U. S. 709, 720 (2005) (construing Religious Land Use and Institutionalized Persons Act of 2000, the Court cautioned that "adequate account" must be taken of "the burdens a requested accommodation may impose on nonbeneficiaries" of the Act); *Caldor*, 472 U. S., at 708–710 (invalidating state statute requiring employers to accommodate an employee's religious observance for failure to take into account the burden such an accommodation would impose on the employer and other employees).  "[O]ne person's right to free exercise must be kept in harmony with the rights of her fellow citizens."  *Hobby Lobby,* 573 U. S., at 765, n. 25 (GINSBURG, J., dissenting).  See also *id.*, at 746 ("[Y]our right to swing your arms ends just where the other man's nose begins." (quoting Chafee, Freedom of Speech in War Time, 32 Harv. L. Rev. 932, 957 (1919))).

In this light, the Court has repeatedly assumed that any religious accommodation to the contraceptive-coverage requirement would preserve women's continued access to seamless, no-cost contraceptive coverage.  See *Zubik* v. *Burwell*, 578 U. S. ___, ___ (2016) (*per curiam*) (slip op., at 4)

––––––––––
[17] But see, *e.g.*, Brief for Professors of Criminal Law et al. as *Amici Curiae* 8–11 (RFRA does not grant agencies independent rulemaking authority; instead, laws allegedly violating RFRA must be challenged in court).  No party argues that agencies can act to cure violations of RFRA only after a court has found a RFRA violation, and this opinion does not adopt any such view.

("[T]he parties on remand should be afforded an opportunity to arrive at an approach . . . that accommodates petitioners' religious exercise while . . . ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage." (internal quotation marks omitted)); *Wheaton College* v. *Burwell*, 573 U. S. 958, 959 (2014) ("Nothing in this interim order affects the ability of applicant's employees and students to obtain, without cost, the full range of [FDA] approved contraceptives."); *Hobby Lobby*, 573 U. S., at 692 ("There are other ways in which Congress or HHS could equally ensure that every woman has cost-free access to . . . all [FDA]-approved contraceptives. In fact, HHS has already devised and implemented a system that seeks to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of [other] companies.").

The assumption made in the above-cited cases rests on the basic principle just stated, one on which this dissent relies: While the Government may "accommodate religion beyond free exercise requirements," *Cutter*, 544 U. S., at 713, when it does so, it may not benefit religious adherents at the expense of the rights of third parties. See, *e.g.*, *id.*, at 722 ("[A]n accommodation must be measured so that it does not override other significant interests."); *Caldor*, 472 U. S., at 710 (religious exemption was invalid for its "unyielding weighting in favor of" interests of religious adherents "over all other interests"). Holding otherwise would endorse "the regulatory equivalent of taxing non-adherents to support the faithful." Brief for Church-State Scholars as *Amici Curiae* 3.

2

The expansive religious exemption at issue here imposes significant burdens on women employees. Between 70,500

and 126,400 women of childbearing age, the Government estimates, will experience the disappearance of the contraceptive coverage formerly available to them, 83 Fed. Reg. 57578–57580; indeed, the numbers may be even higher.[18] Lacking any alternative insurance coverage mechanism, see *supra*, at 7, the exemption leaves women two options, neither satisfactory.

The first option—the one suggested by the Government in its most recent rulemaking, 82 Fed. Reg. 47803—is for women to seek contraceptive care from existing government-funded programs. Such programs, serving primarily low-income individuals, are not designed to handle an influx of tens of thousands of previously insured women.[19] Moreover, as the Government has acknowledged, requiring women "to take steps to learn about, and to sign up for, a new health benefit" imposes "additional barriers," "mak[ing] that coverage accessible to fewer women." 78 Fed. Reg. 39888. Finally, obtaining care from a government-

————————

[18] The Government notes that 2.9 million people were covered by the 209 plans that previously utilized the self-certification accommodation. 83 Fed. Reg. 57577. One hundred nine of those plans covering 727,000 people, the Government estimates, will use the religious exemption, while 100 plans covering more than 2.1 million people will continue to use the self-certification accommodation. *Id.*, at 57578. If more plans, or plans covering more people, use the new exemption, more women than the Government estimates will be affected.

[19] Title X "is the only federal grant program dedicated solely to providing individuals with comprehensive family planning and related preventive health services." HHS, About Title X Grants, www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/index.html. A recent rule makes women who lose contraceptive coverage due to the religious exemption eligible for Title X services. See 84 Fed. Reg. 7734 (2019). Expanding *eligibility*, however, "does nothing to ensure Title X providers actually have capacity to meet the expanded client population." Brief for National Women's Law Center et al. as *Amici Curiae* 22. Moreover, that same rule forced 1,041 health providers, serving more than 41% of Title X patients, out of the Title X provider network due to their affiliation with abortion providers. 84 Fed. Reg. 7714; Brief for Planned Parenthood Federation of America et al. as *Amici Curiae* 18–19.

funded program instead of one's regular care provider creates a continuity-of-care problem, "forc[ing those] who lose coverage away from trusted providers who know their medical histories." NWLC Brief 18.

The second option for women losing insurance coverage for contraceptives is to pay for contraceptive counseling and devices out of their own pockets. Notably, however, "the most effective contraception is also the most expensive." ACOG Brief 14–15. "[T]he cost of an IUD [intrauterine device]," for example, "is nearly equivalent to a month's full-time pay for workers earning the minimum wage." *Hobby Lobby*, 573 U. S., at 762 (GINSBURG, J., dissenting). Faced with high out-of-pocket costs, many women will forgo contraception, Brief for 186 Members of Congress 11, or resort to less effective contraceptive methods, 930 F. 3d, at 563.

As the foregoing indicates, the religious exemption "reintroduce[s] the very health inequities and barriers to care that Congress intended to eliminate when it enacted the women's preventive services provision of the ACA." NWLC Brief 5. "No tradition, and no prior decision under RFRA, allows a religion-based exemption when [it] would be harmful to others—here, the very persons the contraceptive coverage requirement was designed to protect." *Hobby Lobby*, 573 U. S., at 764 (GINSBURG, J., dissenting).[20] I would therefore hold the religious exemption neither required nor permitted by RFRA.[21]

––––––––––

[20] Remarkably, JUSTICE ALITO maintains that stripping women of insurance coverage for contraceptive services imposes no burden. See *ante*, at 18 (concurring opinion). He reaches this conclusion because, in his view, federal law does not require the contraceptive coverage denied to women under the exemption. *Ibid*. Congress, however, called upon HRSA to specify contraceptive and other preventive services for women in order to ensure equality in women employees' access to healthcare, thus safeguarding their health and well-being. See *supra,* at 2–5.

[21] As above stated, the Government does not defend the moral exemption under RFRA. See *supra*, at 13.

B

Pennsylvania and New Jersey advance an additional argument: The exemption is not authorized by RFRA, they maintain, because the self-certification accommodation it replaced was sufficient to alleviate any substantial burden on religious exercise. Brief for Respondents 36–42. That accommodation, I agree, further indicates the religious exemption's flaws.

1

For years, religious organizations have challenged the self-certification accommodation as insufficiently protective of their religious rights. See, *e.g.*, *Zubik*, 578 U. S., at ___ (slip op., at 3). While I do not doubt the sincerity of these organizations' opposition to that accommodation, *Hobby Lobby*, 573 U. S., at 758–759 (GINSBURG. J., dissenting), I agree with Pennsylvania and New Jersey that the accommodation does not substantially burden objectors' religious exercise.

As Senator Hatch observed, "[RFRA] does not require the Government to justify every action that has some effect on religious exercise." 139 Cong. Rec. 26180 (1993). *Bowen* v. *Roy*, 476 U. S. 693 (1986), is instructive in this regard. There, a Native American father asserted a sincere religious belief that his daughter's spirit would be harmed by the Government's use of her social security number. *Id.*, at 697. The Court, while casting no doubt on the sincerity of this religious belief, explained:

"Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family. The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious

beliefs of particular citizens." *Id.*, at 699.[22]

*Roy* signals a critical distinction in the Court's religious exercise jurisprudence: A religious adherent may be entitled to religious accommodation with regard to her own conduct, but she is not entitled to "insist that . . . *others* must conform *their* conduct to [her] own religious necessities.'" *Caldor*, 472 U. S., at 710 (quoting *Otten* v. *Baltimore & Ohio R. Co.*, 205 F. 2d 58, 61 (CA2 1953) (Hand, J.); (emphasis added).[23]  Counsel for the Little Sisters acknowledged as much when he conceded that religious "employers could [not] object at all" to a "government obligation" to provide contraceptive coverage "imposed directly on the insurers." Tr. of Oral Arg. 41.[24]

But that is precisely what the self-certification accommodation does.  As the Court recognized in *Hobby Lobby*: "When a group-health-insurance issuer receives notice that [an employer opposes coverage for some or all contraceptive services for religious reasons], the issuer must then exclude [that] coverage from the employer's plan and provide separate payments for contraceptive services for plan participants." 573 U. S., at 698–699; see also *id.,* at 738 (Kennedy,

———————

[22] JUSTICE ALITO disputes the relevance of *Roy*, asserting that the religious adherent in that case faced no penalty for noncompliance with the legal requirement under consideration.  See *ante*, at 6, n. 5.  As JUSTICE ALITO acknowledges, however, the critical inquiry has two parts.  See *ante*, at 6–7.  It is not enough to ask whether noncompliance entails "substantial adverse practical consequences."  One must also ask whether compliance substantially burdens religious exercise.  Like *Roy*, my dissent homes in on the latter question.

[23] Even if RFRA sweeps more broadly than the Court's pre-*Smith* jurisprudence in some respects, see *Hobby Lobby*, 573 U. S., at 695, n. 3; but see *id.*, at 749–750 (GINSBURG, J., dissenting), there is no cause to believe that Congress jettisoned this fundamental distinction.

[24] JUSTICE ALITO ignores the distinction between (1) a request for an accommodation with regard to one's own conduct, and (2) an attempt to require others to conform their conduct to one's own religious beliefs. This distinction is fatal to JUSTICE ALITO's argument that the self-certification accommodation violates RFRA.  See *ante*, at 6–10.

J., concurring) ("The accommodation works by requiring *in-surance companies* to cover . . . contraceptive coverage for female employees who wish it." (emphasis added)). Under the self-certification accommodation, then, the objecting employer is absolved of any obligation to provide the contraceptive coverage to which it objects; that obligation is transferred to the insurer. This arrangement "furthers the Government's interest [in women's health] but does not impinge on the [employer's] religious beliefs." *Ibid.*; see *supra*, at 18–19.

2

The Little Sisters, adopting the arguments made by religious organizations in *Zubik*, resist this conclusion in two ways. First, they urge that contraceptive coverage provided by an insurer under the self-certification accommodation forms "part of the same plan as the coverage provided by the employer." Brief for Little Sisters 12 (internal quotation marks omitted). See also Tr. of Oral Arg. 29 (Little Sisters object "to having their plan hijacked"); *ante*, at 8 (ALITO, J., concurring) (Little Sisters object to "maintain[ing] and pay[ing] for a plan under which coverage for contraceptives would be provided"). This contention is contradicted by the plain terms of the regulation establishing that accommodation: To repeat, an insurance issuer "must . . . *[e]xpressly exclude* contraceptive coverage from the group health insurance coverage provided in connection with the group health plan." 45 CFR §147.131(c)(2)(i)(A) (2013) (emphasis added); see *supra,* at 6.[25]

_____

[25] Religious organizations have observed that, under the self-certification accommodation, insurers need not, and do not, provide contraceptive coverage under a separate policy number. Supp. Brief for Petitioners in *Zubik* v. *Burwell*, O. T. 2015, No. 14–1418, p. 1. This objection does not relate to a religious employer's own conduct; instead, it concerns the *insurer's* conduct. See *supra*, at 18–19.

Second, the Little Sisters assert that "tak[ing] affirmative steps to execute paperwork . . . necessary for the provision of 'seamless' contraceptive coverage to their employees" implicates them in providing contraceptive services to women in violation of their religious beliefs. Little Sisters Reply Brief 7. At the same time, however, they have been adamant that they do not oppose merely "register[ing] their objections" to the contraceptive-coverage requirement. *Ibid.* See also Tr. of Oral Arg. 29, 42–43 (Little Sisters have "no objection to objecting"); *ante*, at 8 (ALITO, J., concurring) (Little Sisters' "concern was not with notifying the Government that they wished to be exempted from complying with the mandate *per se*"). These statements, taken together, reveal that the Little Sisters do not object to what the self-certification accommodation asks of *them*, namely, attesting to their religious objection to contraception. See *supra*, at 6. They object, instead, to the particular use insurance issuers make of that attestation. See *supra*, at 18–19.[26] But that use originated from the ACA and its once-implementing regulation, not from religious employers' self-certification or alternative notice.

\*　　\*　　\*

The blanket exemption for religious and moral objectors to contraception formulated by the IRS, EBSA, and CMS is inconsistent with the text of, and Congress' intent for, both the ACA and RFRA. Neither law authorizes it.[27] The orig-

—————

[26] JUSTICE ALITO asserts that the Little Sisters' "situation [is] the same as that of the conscientious objector in *Thomas* [v. *Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707, 715 (1981)]." *Ante*, at 9–10. I disagree. In *Thomas*, a Jehovah's Witness objected to "work[ing] on weapons," 450 U. S., at 710, which is what his employer required of him. As above stated, however, the Little Sisters have no objection to objecting, the only other action the self-certification accommodation requires of them.

[27] Given this conclusion, I need not address whether the exemption is

inal administrative regulation accommodating religious ob-
jections to contraception appropriately implemented the
ACA and RFRA consistent with Congress' staunch determi-
nation to afford women employees equal access to preven-
tive services, thereby advancing public health and welfare
and women's well-being. I would therefore affirm the judg-
ment of the Court of Appeals.[28]

––––––––––

procedurally invalid. See *ante*, at 22–26 (opinion of the Court).

[28]Although the Court does not reach the issue, the District Court did
not abuse its discretion in issuing a nationwide injunction. The Admin-
istrative Procedure Act contemplates nationwide relief from invalid
agency action. See 5 U. S. C. §706(2) (empowering courts to "hold unlaw-
ful and set aside agency action"). Moreover, the nationwide reach of the
injunction "was 'necessary to provide complete relief to the plaintiffs.'"
*Trump* v. *Hawaii*, 585 U. S. ___, ___, n. 15 (2018) (SOTOMAYOR, J., dis-
senting) (slip op., at 25, n. 13) (quoting *Madsen* v. *Women's Health Cen-
ter, Inc.*, 512 U. S. 753, 765 (1994)). Harm to Pennsylvania and New
Jersey, the Court of Appeals explained, occurs because women who lose
benefits under the exemption "will turn to state-funded services for their
contraceptive needs and for the unintended pregnancies that may result
from the loss of coverage." 930 F. 3d, at 562. This harm is not bounded
by state lines. The Court of Appeals noted, for example, that some
800,000 residents of Pennsylvania and New Jersey work—and thus re-
ceive their health insurance—out of State. *Id.*, at 576. Similarly, many
students who attend colleges and universities in Pennsylvania and New
Jersey receive their health insurance from their parents' out-of-state
health plans. *Ibid.*